# JAMES LARRY CHERRY *v.* STATE OF MARYLAND

[No. 480, September Term, 1972.]

*Decided July 5, 1973.*

The cause was argued before ORTH, C. J., and MOYLAN and CARTER, JJ.

*Michael D. Jackley,* with whom were *Williams, Brown, Baldwin & Jackley* on the brief, for appellant.

*Gary Melick, Assistant Attorney General,* with whom

were *Francis B. Burch, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *Frank H. Santoro, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellant, James Larry Cherry, was convicted in the Circuit Court for Montgomery County by a jury, presided over by Judge Plummer M. Shearin, of soliciting for "purposes of prostitution, lewdness and assignation" in violation of Article 27, Section 15 (e). The appellant mounts two constitutional attacks upon his conviction:

(1) That Section 15 (e), either on its face or as applied to the particular facts of this case, is an unconstitutional abridgment of the freedom of speech guaranteed by the First Amendment; and

(2) That Section 15 (e) is unconstitutional under the Fifth and Fourteenth Amendments because of vagueness and overbreadth.

### The Facts in this Case

On Sunday, May 2, 1971, there appeared, under the category "Help Wanted," the following classified ad in *The Washington Post*:

### Receptionist

Single, attractive age 20-25, to schedule and coordinate office activities. Call 585-7508. 8750 Georgia Ave. Suite 140E. S.S.

On the following Monday, Miss Virginia Rice, a 24-year-old cashier for People's Hardware, called the listed number and made an appointment for the following day. On Tuesday, May 4, she appeared at 1 p.m. at 8750 Georgia Avenue for an interview. After filling out an application blank, Miss Rice was ushered into the office of the appellant where she was interviewed for approximately an hour and a half. The nature of the appellant's business operation was never specifically established. After routine preliminary

questioning, the appellant volunteered that Miss Rice "didn't have a very glamorous life" and "had been pushed around" and "needed a little bit more money to make [her] life more glamorous and interesting." The appellant indicated that Miss Rice's work would require "entertaining clients." The interview terminated shortly thereafter. Miss Rice was told that she might be contacted at a later time.

At 7 p.m. that evening, the appellant called Miss Rice and requested her to return to the office for a further interview. She agreed to do so, arriving back at 8750 Georgia Avenue at approximately 7:30 p.m. The appellant repeated that Miss Rice would have to "entertain his clients" and added that everything must be "very confidential." He then got up, closed the blinds to the picture window behind him, and asked Miss Rice to undress. She declined. He then asked specifically whether Miss Rice "would consider going out with clients and entertaining them." She asked for a further explanation. He explained that he meant "going to bed with them and dinner and dancing, you know, going to motels and things like that." Somewhat flabbergasted, Miss Rice could only come up with the reply that she preferred "going out with men my own age." The appellant then asked, "Would you consider going down on me?" Miss Rice replied, "No." The appellant then inquired if Miss Rice understood the terminology and was assured that she did. The appellant added, "Some of our other clients like other sex besides just going to bed with each other." The appellant proceeded to explain to Miss Rice "what these clients like to have done to them besides regular intercourse." She was quoted a salary of $110 per week plus bonuses when she would "entertain clients." The appellant added that he would give her help in picking out clothes to fit her figure, that he would send her to a salon to have weight taken off, and that she would be taught how to walk and how to make herself glamorous. Miss Rice left the office and went home. The following day, she reported the entire incident to the Montgomery County Police.

In response to the lead furnished by Miss Rice, Detective Ingrid Gibson, a six-year veteran of the Juvenile Section of

the Montgomery County Police Department, undertook the undercover assignment of posing as a job applicant before the appellant. Her cover story required her to take the name Myrna Case and to represent herself as a divorcee who had worked as a hostess-waitress in a bar for approximately two years. She called the appellant's office for an appointment and was granted an interview on May 6. A receptionist indicated that there would be a typing test. Mrs. Gibson replied that she did not type well and was only interested in the position of receptionist. She was told not to worry about the typing test. Mrs. Gibson was interviewed by a man by the name of Mr. Mack who explained that he felt that she needed a counselor, that he was going out of town, that he really did not have the time to interview her properly and that he had an associate by the name of Mr. James whom she should talk to. She left the office with the understanding that she would be contacted on the following Monday. At her listed address at the Jo Ann Motel, she received a call from the appellant at approximately 11:15 p.m. that very evening. He indicated that he wished her to come into the office on Saturday so that he could interview her "without the pressures of other people being there." She met the appellant at the office at approximately 3 p.m. that Saturday. She was told to sever any existing relationships with other men. She was told that the appellant's clients were "extremely important people" and that "secrecy was of the utmost importance." Her job was explained to her as being essentially that of "a companion to the client, that many jobs would require traveling possibly with the clients, staying with them for a number of weeks, for a number of months, or possibly just for one night." The appellant told her that he could tell "by the look in [her] eyes that [she] had no objections to going to bed with people, that [she] enjoyed sex, that [she] was a hot-blooded passionate person." The appellant volunteered that Mrs. Gibson "probably had experienced a variety of sex" and that she "would not be adverse to doing anything that would be required of [her], that the client would require different types of sex sometimes, because of the fact that they had

important jobs, they would have a hard day, and the way it was put, that they would have a hard time getting it up, and, therefore, not to smash a man's ego by making overtures [herself]." She was told that "most of the girls who worked for [the appellant] were masters at understanding people, that it was of utmost importance to preserve the man's ego, and, more or less, anticipate their wants and comply accordingly."

Mrs. Gibson was told by the appellant that she would be paid in terms of bonuses and that she would be well rewarded for her services. She was told explicitly that those services consisted of "going to bed with clients." All negotiations with the clients were to be handled by the appellant or his associates. Mrs. Gibson would be notified when a client was coming to see her and the client would know the purpose of the visit. The interview concluded at approximately 6 p.m. Mrs. Gibson was told that she would be contacted again at her motel, probably on the following Monday. The appellant indicated that he wanted to see her at her motel room and "that there was a test, which he didn't really explain at that time."

On Monday, May 10, the appellant came to the motel room at approximately 6 p.m. Mrs. Gibson was asked whether she "had ever worked conventions or gone to bed with more than one person at one time." The appellant assured Mrs. Gibson that his clients were not of that caliber. The appellant made frequent references to fellatio and repeatedly asserted that he was sure that Mrs. Gibson "had no aversions about any different type of sexual activity with people." In referring again to "the test," the appellant made it clear that the test consisted of going to bed with him or with one of his associates and that the purpose of this was "to enable us to grow together." The appellant explained that they were "a very close organization, the girls were loyal" and that they helped set their girls up in business "after they finished working for them." He cited as an example one Tinker Bell who had been one of his "girls" who had been subsequently set up in a nightclub in the District of Columbia. The appellant then left, indicating that he would return to the

motel room for one further visit for "the ultimate test as to whether or not [Mrs. Gibson] would have the job." Before the "ultimate test" occurred, the Montgomery County Police, acting upon Mrs. Gibson's information, arrested the appellant.

The evidence amply demonstrates that the appellant violated Article 27, Section 15 (e) which provides, in pertinent part:

> "It shall be unlawful:
> (e) To procure or to solicit . . . for the purpose of prostitution, lewdness or assignation; "

The appellant, by way of defense upon this appeal, relies exclusively upon the claimed unconstitutionality of Section 15 (e), in two regards.

### Solicitation and Free Speech

The thrust of the appellant's First Amendment argument is that all he did was to utter words and to communicate thoughts — conduct which no criminal law may constitutionally abridge. He reads the freedom of speech clause too broadly. Various forms of speech have long been held to be without the protective umbrella of the First Amendment. *Roth v. United States,* 354 U. S. 476, 77 S. Ct. 1304, 1 L.Ed.2d 1498 (obscenity); *New York Times Co. v. Sullivan,* 376 U. S. 254, 84 S. Ct. 710, 11 L.Ed.2d 686 (libel); *Chaplinsky v. New Hampshire,* 315 U. S. 568, 62 S. Ct. 766, 86 L. Ed. 1031 (fighting words); *Dennis v. United States,* 341 U. S. 494, 71 S. Ct. 857, 95 L. Ed. 1137 (advocacy of governmental overthrow). We look now specifically to speech which constitutes solicitation to a criminal act.

The inchoate crimes generally are of recent vintage in the history of the common law.[1] The latest and the least of these is solicitation. Its first formulation, as something distinct

---

1. Conspiracy, as we now know it, dates only from the *Poulterers Case* in 1611, 9 Co. 55b, 77 Eng. Rep. 813 (Star Chamber). See *Developments in the Law: Criminal Conspiracy,* 72 Harv. L. Rev. 920 (1959); Sayre, *Criminal Conspiracy,* 35 Harv. L. Rev. 393 (1922). The general law of attempts dates only from the creative genius of Lord Mansfield in *Rex v. Scofield* in 1784, 1 Cald. 397. See Sayre, *Criminal Attempts,* 41 Harv. L. Rev. 821 (1928).

from a mere aspect in the law of attempts, was in *Rex v. Higgins* in 1801, 2 East 5, 102 Eng. Rep. 269. As persuasively declarative of pre-existing common law, *Rex v. Higgins* was followed by landmark decisions in *State v. Avery*, 7 Conn. 266, 18 Am. Dec. 105 (1828), and *Commonwealth v. Flagg*, 135 Mass. 545 (1883). Solicitation is now universally recognized in the United States as a part of Anglo-American common law.[2] In Clark and Marshall, *Law of Crimes* (7th ed., 1967), its characteristics are well set out, at 219-223:

> "Solicitation is a distinct common-law misdemeanor in which the act forbidden consists of the accused person's parol or written efforts to activate another to commit a criminal offense. It is immaterial whether the solicitation is of any effect and whether the crime solicited is in fact committed . . .
>
> The gist of this offense is incitement. In brief, the gravamen of this common-law misdemeanor lay in counselling, enticing, or inducing another to commit a crime . . .
>
> Inciting or soliciting another to commit a crime is the act of the least magnitude which is punishable by the common law. In such offenses the actor does nothing himself but he urges others to violate the law. The necessity for punishing such persons is obvious, and such conduct is generally punished as a substantive crime, notwithstanding the solicitation does not move the party solicited to commit the offense."

See also Perkins, *Criminal Law* (1969), 582-588; 21 Am.Jur.2d, *Criminal Law*, Sect. 114, "Solicitation as substantive offense"; 22 C.J.S., *Criminal Law*, Sect. 78, "Solicitation."

---

**2.** See Curran, *Solicitation: A Substantive Crime*, 17 Minn. L. Rev. 499 (1933); Blackburn, *Solicitation to Crimes*, 40 W. Va. L. Q. 135 (1934); Hitchler, *Solicitations*, 41 Dick. L Rev. 225 (1937); Wechsler, Jones and Korn, *Treatment of Inchoate Crimes in the Model Penal Code of the American Law Institute: Attempt, Solicitation and Conspiracy*, 61 Columbia L. Rev. 957 (1961).

There is a genuine split of authority, however, as to the grade of the solicited criminal offense which will give rise to an indictable solicitation. England apparently and several American states consider the misdemeanor of solicitation to apply to any indictable misdemeanor.[3] A number of states limit the object of a criminal solicitation to felonies and serious misdemeanors which tend to a breach of the peace.[4] Some states limit the object of the solicitation to a felony.[5] When Maryland first considered the crime of solicitation in 1887, it placed itself in this latter category, limiting the object of a criminal solicitation to a felony. *Lamb v. State*, 67 Md. 524 (over the strong dissent of Chief Judge Alvey joined by Judge Irving).

Some states which have abolished common law crimes have created statutory solicitations with certain enumerated crimes as cognizable objects of the solicitation.[6] Some states which have limited the object of common law solicitation to felonies have by statute extended the object of solicitation to specified misdemeanors. Maryland, by Chapter 737 of the Acts of 1920, made it a misdemeanor "To procure or to solicit or to offer to procure or solicit for the purpose of prostitution, lewdness or assignation," which provision is now codified as the Art. 27, Sect. 15 (e) under present discussion.

It is clear that when a legislature adds to the list of crimes which may be the objects of a criminal solicitation, it does not alter the general character of the act of solicitation itself. In *Riley v. United States*, 298 A. 2d 228, the Court of Appeals for the District of Columbia was dealing with Section 22-2701 of the D.C. Code 1967, which provided:

"It shall not be lawful for any person to invite,

---

**3.** Kenny, *Outlines of Criminal Law* (14th ed, 1933), 81; *State v. Schleifer*, 99 Conn. 432, 121 A. 805 (1923); *State v. Bonds*, 2 Nev. 265.

**4.** *State v. Boyd,* 86 N.J.L. 75, 91 A. 586 (1914); *Commonwealth v. Wiswesser*, 134 Pa. Super. Ct. 488, 3 A. 2d 983 (1939); *Cox v. People*, 82 Ill. 191 (1876).

**5.** *Reed v. Maley*, 115 Ky. 816, 74 S. W. 1079; *Cole v. State*, 14 Okla. Cr. 18, 166 P. 1115.

**6.** *See, for example, Penal Code of California* (1931), Sect. 653 (f).

entice, persuade, or to address for the purpose of inviting, enticing, or persuading, any person or persons sixteen years of age or over in the District of Columbia, for the purpose of prostitution, or any other immoral or lewd purpose. . . ."

It made clear that the statutory solicitation would be evaluated by the established principles governing solicitations generally at the common law. It said, at 230-231:

"Thus, it is appropriate to determine if similarity exists between the common-law and contemporary usage of the words used in § 22-2701. . . . Historically, 'urging, inciting, requesting, or advising another person to commit a crime' was in itself punishable as the crime of solicitation. . . . However, only the solicitations of felonies and certain misdemeanors were punishable. . . .

In light of the nature of the offense of solicitation as found at common law, § 22-2701 must necessarily be construed as limited to solicitations of acts which if accomplished would be punishable as a crime."

It is clear that the solicitation proscribed by our Section 15 (e) is limited to objects which are themselves crimes against the State of Maryland. Section 15 (g) explicitly provides that it shall be unlawful "To engage in prostitution, lewdness or assignation by any means whatsoever." Section 17 then provides penalties of up to $500 in fine or up to one year imprisonment or both for violations of any of the provisions of Section 15. The appellant's bold assertion, unsupported by any authority, that the crime of solicitation punishes mere words and is, therefore, violative of the First Amendment, is not persuasive. Solicitation is an act. In the progenitor case of *Rex v. Higgins* itself, Justice Lawrence said:

"The whole argument for the defendant turns upon a fallacy in assuming that no act is charged to have been done by him; for a solicitation is an act. The offense does not rest in mere intention; for in

soliciting Dixon to commit the felony, the defendant did an act towards carrying his intention into execution."

Even so fervent a champion of free speech as Zechariah Chafee acknowledged that the broad social purposes behind the First Amendment did not extend the protection of that amendment to verbal acts soliciting criminal conduct:

"The law of attempts and solicitation is directed not against the words but against acts, and the words are punished only because that is the necessary way to avoid harmful acts. When A urges B to kill C and tells him how he can do it, this has nothing to do with the attainment and dissemination of truth . . ." [7]

As aptly stated by Judge Learned Hand in *Masses Publishing Co. v. Patten*, 244 F. 535, 540 (S.D.N.Y.): [8]

"One may not counsel or advise others to violate the law as it stands. Words are not only the keys of persuasion, but the triggers of action, and those which have no purport but to counsel the violation of law cannot by any latitude of interpretation be a part of that public opinion which is the final source of government in a democratic state."

The words of the Supreme Court in *American Communications Association v. Douds*, 339 U. S. 382, 70 S. Ct. 674, 94 L. Ed. 925 (1950), are here appropriate:

"Although the First Amendment provides that Congress shall make no law abridging the freedom of speech, press or assembly, it has long been established that those freedoms themselves are dependent upon the power of constitutional

---

**7.** Chafee, *Freedom of Speech*, (1920), p. 173.

**8.** Judge Hand actually found that an incitement to crime had not occurred. The United States Court of Appeals reversed, holding that the words spoken did constitute an incitement to crime. 246 F. 24 (2d Cir. 1917).

262

government to survive. If it is to survive it must have power to protect itself against unlawful conduct and, under some circumstances, against incitements to commit unlawful acts. Freedom of speech thus does not comprehend the right to speak on any subject at any time." 339 U. S. at 394.

The appellant places great reliance on two trial-level decisions of the Superior Court of the District of Columbia, Criminal Division, both by Judge Charles W. Halleck: *United States v. Binns* (decided May 31, 1972) and *United States v. Moses* (decided November 3, 1972), 12 Cr. L. 2198-2201. Both cases involved violations of Section 22-2701 of the D.C. Code, hereinbefore discussed. In *Binns*, there had been a solicitation of an undercover policeman to an act of sodomy. In *Moses*, there had been a solicitation of an undercover policeman to an act of prostitution. In both cases, Judge Halleck ruled that Section 22-2701 represented an unconstitutional abridgment of the First Amendment. The *Binns* holding rested in part upon Judge Halleck's ruling that the D.C. statute prohibited solicitation to homosexual activity, which he ruled was not a crime in the District of Columbia.[9] The *Moses* holding rested in significant measure upon the fact that prostitution is not a crime in the District of Columbia. Judge Halleck's decision explicitly distinguished the situation in the District of Columbia, where the act of solicitation had as its object non-criminal conduct, from the situation in Maryland, where a solicitation to prostitution has an object which is criminal. Judge Halleck reasoned:

"Speech must directly engender a concrete evil, such as a criminal act, a breach of the peace, or a public nuisance, before it loses the protection of the First Amendment. . . .

Prostitution per se is not a crime in the District

9. In *Riley v. United States, supra*, the District of Columbia Court of Appeals ruled otherwise. It pointed out that although the status of being a homosexual is not in and of itself a crime, an act of sodomy or of oral perversion is very definitely a crime in the District of Columbia.

of Columbia, nor has it ever been. Accordingly, the common law doctrine of solicitation sanctioned by the First Amendment cannot justify D.C. Code Section 22-2701. While solicitation to commit a crime may properly be proscribed, it would be anomalous to punish someone for soliciting another to commit an act which is itself not a crime, and that is precisely what is involved here. . . ."

*Riley v. United States, supra,* in overruling implicitly the lower court's decision in *Binns,* made it clear that the District of Columbia law prohibiting solicitation "for the purpose of prostitution, or any other immoral or lewd purpose" is constitutional, just so long as the object of the solicitation is an act prohibited by statute. The court in *Riley* held, at 232-233:

"Appellant also contends that through enforcement of this statute his First Amendment right to freedom of speech has been violated and asserts that his conduct was merely a constitutionally protected exercise of that right. We must therefore determine if the statute as construed proscribes speech which falls within the protected area of the First Amendment. Not all speech is so protected. . . .

We hold that prohibiting solicitation for the offense of sodomy is within the domain of state power. We know of no authoritative holding which extends First Amendment protection to a solicitation to commit an act lawfully prohibited by statute. Accordingly, § 22-2701 does not offend the First Amendment protection of freedom of expression."

We see no theoretical distinction between solicitation to commit kidnapping, murder or treason, on the one hand, and to commit prostitution, lewdness or assignation, on the other. The appellant intimates that there should be a difference, because the latter solicitations somehow intrude

upon an ill-defined "zone of privacy" protected by *Griswold v. Connecticut*, 381 U. S. 479, 85 S. Ct. 1678, 14 L.Ed.2d 510 (1965). His constitutional attack is misdirected. If consummated crimes themselves are constitutional in terms of their criminality, a proposition which the appellant does not attack at bar, then constitutionality follows as to their incipient or inchoate phases. If a constitutional attack is to be mounted, it must be against the consummated crime itself rather than be interposed between the consummated act and one of its inchoate stages such as conspiracy, attempt or solicitation. We see no First Amendment impediment to the conviction at bar.

We note, moreover, that the Court of Appeals in *Savoy v. State*, 236 Md. 36, 202 A. 2d 324, affirmed a conviction for a violation of Section 15 (e), even though the constitutionality of the statute was not there at issue.

### Lewdness and Vagueness

Nor may the appellant prevail upon his contention that Section 15 (e) is void for vagueness or overbreadth. Section 16 very precisely limits the terms of Section 15 (e):

> "The term 'prostitution' shall be construed to mean the offering or receiving of the body for sexual intercourse for hire. The term 'lewdness' shall be construed to mean any unnatural sexual practice. The term 'assignation' shall be construed to include the making of any appointment, or engagement for prostitution or lewdness or any act in furtherance of such appointment or engagement."

"Prostitution" and "assignation" could not be more precisely defined. "Lewdness" is defined as "any unnatural sexual practice," which might yet raise a question of imprecision had not that latter term itself been very explicitly defined by Article 27, Section 554, which provides, in pertinent part:

> "Every person who shall be convicted of taking into his or her mouth the sexual organ of any other

person or animal, or who shall be convicted of placing his or her sexual organ in the mouth of any other person or animal, or who shall be convicted of committing any other unnatural or perverted sexual practice with any other person or animal, shall be fined not more than one thousand dollars ($1,000.00), or be imprisoned in jail or in the house of correction or in the penitentiary for a period not exceeding ten years, or shall be both fined and imprisoned within the limits above prescribed in the discretion of the court."

*Blake v. State*, 210 Md. 459, 124 A. 2d 273, disposes of the argument that Section 554 might be void for vagueness. It explicitly holds that it is not. *Blake* also includes sodomy, independently proscribed by Article 27, Section 553, and carrying its own penalty as well as felony status, as falling within the definition of "unnatural or perverted sexual practice."

*Hughes v. State*, 14 Md. App. 497, 287 A. 2d 299, disposes of the argument that Section 554 is unconstitutional for overbreadth. Chief Judge Orth there reasoned that whatever the constitutional protection surrounding "private consensual sexual acts between married couples" might be, that protection would not extend to one not in that category. Judge Orth there said, at 14 Md. App. 504-505:

"We share the sentiments of the court in *Pruett v. State*, 463 S.W.2d 191, 195 (Texas 1970) that to extend the protection of this right of privacy of the marital union to strike down a statute proscribing cunnilingus, fellatio, and the whole field of other unnatural or perverted sexual practice, when successful prosecution of private consensual sexual acts between married couples are at most only 'conceivable', is not consistent with the description of the marriage relationship and right of privacy described by Mr. Justice Douglas."

Reasoning similarly, we do not recognize standing in one such as the appellant at bar, who was endeavoring to exploit

266

sex commercially, to invoke the protections which might attach to consenting adults on a non-commercial basis, whatever those protections might or might not be.

If the consummated crimes of prostitution, lewdness (to wit, "unnatural sexual practices" as defined by Section 554 and *Blake v. State*), and assignation are not themselves unconstitutional for vagueness or for overbreadth, and it has been held that they are not, then it follows that the ancillary and inchoate crime of soliciting the commission of an act of prostitution, lewdness or assignation is similarly not unconstitutional for vagueness or for overbreadth.

*Judgment affirmed.*
*Costs to be paid by appellant.*