# GENE THOMAS MEYER *v.* STATE OF MARYLAND

[No. 699, September Term, 1980.]

*Decided February 6, 1981.*

The cause was argued before THOMPSON, WILNER and COUCH, JJ.

*John T. Bell* and *Elbert R. Shore,* with whom were *Frank S. Cornelius, Alfred L. Rehder, James R. Clifford, Richard S. Ulf, Andrew Askland* and *Bell, Cornelius & Shore* on the brief, for appellant.

*F. Ford Loker, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Joseph C. Sauerwein, Deputy State's Attorney for Prince George's County,* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

On April 26, 1978, a jury in the Circuit Court for Prince George's County found appellant guilty of the first degree murder of Carol Lewis and the second degree murder of Heather Lewis. The victims were, respectively, the wife and infant daughter of one Lon Alec Lewis; and it was alleged that the murders were committed pursuant to an agreement with Mr. Lewis — that they were, in colloquial terms, "contract murders." Appellant ultimately was sentenced to consecutive terms of life and thirty years imprisonment for those crimes, and the convictions were affirmed on appeal. *See Meyer v. State,* 43 Md. App. 427 (1979), *cert. den.* 286 Md. 750, *cert. den.* 446 U.S. 938, 64 L. Ed. 2d 792 (1980). Lewis was also tried and convicted for his complicity. *See Lewis v. State,* 285 Md. 705 (1979).

Appellant was not sentenced on April 26. The court deferred sentencing pending (possibly among other things) receipt of a presentence investigation report; and appellant was lodged at the Prince George's County Detention Center during the interim.

While at the Center awaiting sentencing, appellant attempted to set in motion a plan for four more killings. Specifically, according to the record before us, he sought to arrange for the killing of his wife, Mr. Lewis, and two police

officers who had investigated the Lewis killings and succeeded in extracting a confession from him (Detectives Hatfield and Morrissette). Fortunately for the intended victims, but unfortunately for appellant, the person he solicited to carry out or arrange for these executions was an undercover State policeman, Frank Mazzone, who recorded the two conversations he had with appellant pertaining to this scheme.

By reason of these activities, appellant was charged with four counts of solicitation of murder — one count for each intended victim. He was convicted on all four counts, given four consecutive sentences of twenty years each (consecutive to the life plus thirty already being served), and now appeals. He claims:

"1. The Trial Judge Erred In Denying Appellant's Motion For Judgment Of Acquittal Where The Evidence Indicated That The Appellant Solicited Mazzone Not To Murder The Intended Victim As Charged But Rather To Solicit Others To Carry Out The Intended Murder And In Instructing The Jury That The Appellant Should Be Found Guilty If It Was Proven That He Solicited Mazzone To Have The Murders Committed.

2. The Trial Judge Erred In Imposing Four (4) Consecutive Twenty (20) Year Sentences Upon The Appellant Where The Criminal Act Of The Appellant Was One Continuous Series Of Conversations Wherein He Made The Solicitation.

3. The Trial Judge Erred In Denying Appellant's Motion To Suppress The Tapes Recording The Conversations Between Himself And Mazzone Where The Statements Of The Appellant Were Obtained By The Police In Violation Of Appellant's Constitutional Right To Counsel."

We find no merit in any of these contentions.

Appellant's initial contact with regard to his plan was with Joseph Walker, a co-inmate at the Detention Center. He asked whether Walker knew "anyone who did contract killings or hits." Walker responded in the affirmative, whereupon, according to Walker, appellant "asked me if I could arrange for a killing." He did not tell Walker who the victim or victims were to be. Walker passed this information on to a Prince George's County policeman, for whom he had served as an informant. With the concurrence of the State's Attorney's Office, it was arranged for Captain Mazzone, of the State Police, to play the role of Vince Rinaldo, an agent for two "hit men" and, wearing a secret transmitter, to meet with appellant at the Detention Center and find out more about what he had in mind.

. Two meetings took place, and in both instances the conversation was recorded and transcribed. At the first meeting, on May 8, 1978, appellant very clearly importuned Mazzone to kill, or to arrange for others to kill, appellant's wife. At the second conversation, on May 15, 1978, there was further discussion about the liquidation of the wife and additional importunings of Mazzone to kill, or to arrange for others to kill, the two police officers and Lon Alec Lewis.

The conversations tended to ramble a bit, but what essentially came through was this:

(1) As to the wife, appellant explained that he was upset with her because she failed to testify in his behalf. She was then living in Puerto Rico, and, in order to facilitate the execution, appellant told Mazzone in some detail what her living arrangements were. He described his wife's appearance and also made arrangements for Mazzone to obtain a picture of her from appellant's apartment.

(2) There was a great deal of discussion about the fee for murdering the wife, the parties finally agreeing on $40,000. Appellant promised a deposit of $1,000 "up front," to be taken from an existing bank account in Minnesota, with the balance to be paid from the proceeds of a $100,000 insurance policy on the wife's life.[1] Indeed, as that policy was about to

---

1. Because the policy had a "double indemnity" provision, appellant assumed that he would receive $200,000 upon his wife's demise.

lapse because of nonpayment of premiums, appellant insisted that the killing take place before May 15. He told Mazzone that he didn't care what method was used, but would leave that up to the actual executioner. Appellant did, in fact, later procure a $1,000 money order payable to Vince Rinaldo which he caused to be sent to Mazzone.

(3) The scheme to kill the two officers and Lewis came up in the second conversation, which was initially prompted by the fact that Mazzone had not yet received the $1,000 deposit. After some discussion about that and some further conversation about the execution of the wife, appellant broached the subject of killing the two officers. He told Mazzone that he didn't want them around as witnesses in the event of a second trial.[2] There was no rush about doing away with the officers; as appellant put it, "I suppose anytime, they say a year before the appeal, so anytime within the next year, so its [sic] not really pushing it."

Notwithstanding the permissible delay in implementation, appellant and Mazzone did arrive at a definite agreement as to their ultimate disposition. Appellant gave Mazzone the names of the officers and told him where they worked. They agreed on a fee of $80,000 for the two officers, over and above the $40,000 for the wife.

(4) Lewis was almost an afterthought. Near the end of the second conversation, appellant indicated a desire to be rid of him as well. This part of the conversation is most relevant:

| "FRANK (MAZZONE): | All right, what do you want to do with him? |
|---|---|
| GENE (APPELLANT): | Um, same thing with Hatfield or Morrisette [the two officers] if that's. . . . |
| FRANK: | Is he on the street right now |

---

2. Appellant seemed optimistic that his convictions would be overturned on appeal and was looking ahead to the likelihood of a retrial.

| | |
|---|---|
| GENE: | No, he's up here — second floor |
| FRANK: | Does he know your [*sic,* you're] here? |
| GENE: | Disappears or if he dies, people collect _____ _____people ask too many questions here. |
| FRANK: | You, you do want him dead, or you don't. |
| GENE: | I do." |

Ultimately, it was agreed that Mazzone should wait until Lewis was transferred from the Detention Center to the State prison where the killing would be easier to accomplish.[3] Appellant promised an additional fee of $9,000 for Lewis.

Walker had told appellant that Mazzone was a "legal representative of . . . two professional hitmen." Mazzone never represented himself as a lawyer, and in fact never made clear to appellant what his supposed relationship was with whomever was to commit the murders. Indeed, there is nothing in the transcript of the conversations to foreclose the possibility that Mazzone himself would be the actual "hitman." Throughout the conversations, when referring to the killings, Mazzone used the plural pronoun "we" — "Then *we* do the job," "if *we* got to go to Pureto Rico . . .," "what do you want to show that *we* did the job? *We* bring you something back?" "*we* got a standard way *we* do things." By way of contrast, when referring to things he individually would do, such as retrieve the picture of appellant's wife from his apartment, Mazzone used the singular pronoun, "I." In short, although he said nothing directly to dispel any notion that he was merely an agent for others, Mazzone, in

---

**3.** At the time, Lewis was either awaiting trial or he had already been tried and was awaiting sentence. *See Lewis v. State, supra,* 285 Md. 705.

his own conversations with appellant, clearly portrayed himself as an integral part of a group willing to carry out contract murders, without indicating who would actually "do the job." [4]

With this background, we may dispose of appellant's complaints.

## (1)

Appellant's first challenge, both as to the sufficiency of the evidence and the jury instructions, rests upon the premise that Mazzone was acting solely as an agent for others rather than as the "hitman" himself, and that his entreaties to Mazzone were made upon that understanding. His argument is a technical one, proceeding from this syllogism: (i) In Maryland, the common law crime of solicitation requires as its object the commission of a felony; (ii) the evidence here establishes at best (or worst) an importuning of Mazzone to enter into a conspiracy to have other persons commit the murders and not to commit the murders himself; (iii) the entering into a conspiracy in Maryland is a misdemeanor; (iv) *ergo,* as the sole object of his entreaties to Mazzone was the commission of a misdemeanor, he cannot be adjudged guilty of common law solicitation.

---

4. In his trial testimony, Mazzone expressly denied representing himself as an attorney. This colloquy, on cross-examination, is illustrative:

"Q. Did you in your activities and conversations with Meyer lead him to believe that you were in fact an attorney?

A. Well, I guess I can't really say what he believed but I led him to believe that I would commit a murder for him. If he felt that I was an attorney, I couldn't say.

Q. That you would commit a murder or that you would get someone to commit a murder?

A. Well, again, I guess I don't know what he was thinking, but probably that I would do it or I would have someone to do it. I don't know which way he was taking it.

Q. You do not know which way he was taking it?

A. No, sir.

Q. Well, you did note on your prior testimony then that you would appear for him to other people as an attorney to seek their services?

A. I never said anything about being an attorney to Mr. Meyer."

We need not examine in any detail the correctness of appellant's asserted legal propositions because his factual predicate for them is incorrect.[5] For one thing, Mazzone's testimony and the transcript of the conversations with appellant permit a fair and reasonable inference that Mazzone/Rinaldo was negotiating as a potential "hitman" himself or as one who would not only arrange the killings but be present at the scene of their commission. Even accepting appellant's view that Mazzone was merely an agent not intending to commit the murders (or be present at their commission), he nevertheless would clearly have been an accessory before the fact had the murders actually been committed by his "clients." At the very least, Mazzone/Rinaldo's role was to aid, counsel, command, or encourage the commission of the killings. In either case, whether his role was that of actual participant or accessory before the fact, he would have been culpable as a principal had the murders been committed by reason of his efforts. *See State v. Ward,* 284 Md. 189 (1978).

It is clear, therefore, that the object of appellant's solicitation was for Mazzone to commit murder, a felony; and thus, even under the *Cherry dicta,* the evidence sufficed to establish the crime of criminal solicitation.

(2)

Appellant next asserts, in a somewhat confused fashion, that the imposition of four consecutive sentences was inappropriate since, at best (or worst) only one criminal

---

**5.** Appellant's first premise — that to constitute common law criminal solicitation the object of the entreaty must be the commission of a felony — is based upon *obiter dicta* used in *Cherry v. State,* 18 Md. App. 252, 259 (1973). *Cherry* involved a prosecution under a *statutory* solicitation charge — Md. Ann. Code art. 27, § 15 (e), prohibiting the procuring or soliciting for purposes of prostitution, lewdness or assignation — and therefore did not directly involve the more general common law offense. Cherry argued that the statute was unconstitutional under the First Amendment in that it abridged his freedom of communication. In addressing that issue, the Court described the general nature and history of solicitation offenses, and it was in that context that we viewed the vintage case of *Lamb v. State,* 67 Md. 524 (1887), as requiring that the object of the solicitation be the commission of a felony. Such an interpretation was not necessary to the decision in *Cherry.*

solicitation was involved. The object or thrust of his argument is clear — he seeks to vacate at least three of the sentences — but the argument itself is ambiguous in terms of both the precise nature of the complaint and the legal theory offered in support of it.

The contention is initially framed in his brief, and was expounded at oral argument, as an attack only upon the multiple sentences and not upon the underlying multiple convictions. Yet the basis of his complaint is the assertion that only one criminal act occurred, which, if true, would impact as much, if not more, upon the validity of the several convictions as upon the sentences imposed on them. In laying out his theory, he weaves back and forth between the argument that only one incitement took place and the contention that the doctrine of merger, as laid down in *Newton v. State,* 280 Md. 260 (1977), is applicable, which presupposes the existence of separate crimes that, under common law, or Constitutional double jeopardy strictures, have to be merged one into the other.

In order to address the issue, we first have to define it. Ordinarily, if an appellant limits his attack to the sentence, we will not consider any non-jurisdictional defect in the underlying conviction. Maryland Rule 1085. Here, however, given the nature of appellant's complaint, it would be impossible for us to consider his objection solely in the context of the multiple sentences; it so obviously relates to the multiple convictions as well that we must, of necessity, consider and resolve the broader question of whether it was proper to charge, convict, and sentence appellant on four separate counts of solicitation upon the evidence in this case. Consecutive sentences are permissible only for distinct violations of law. *Kaylor v. State,* 285 Md. 66 (1979).

Having set the question for review, we turn to the legal issue which, as we have observed, is also a bit muddled. Appellant's most elemental position is that the gist of a criminal solicitation is the incitement, and that the evidence here established but one such incitement, notwithstanding that multiple victims were involved. He draws an analogy in this regard to the crime of conspiracy, the gist of which is the

unlawful agreement among the conspirators; and, pointing to cases such as *Braverman v. United States,* 317 U.S. 49 (1942), he argues that a single agreement to commit more than one unlawful act is still but one conspiracy for which but one punishment may be imposed. The same rule, he claims, applies to a criminal solicitation.

This does seem to be the real issue here — not whether there are separate crimes that should be merged, but whether there were, in the first place, separate crimes established by the evidence. If, assuming arguendo the validity of appellant's analogy to the crime of conspiracy, the evidence showed only one act of incitement, there would arise only one act of criminal solicitation and thus nothing to merge. If, on the other hand, the evidence sufficed to establish separate and distinct acts of incitement, there would arise several act of solicitation, and they would not be mergeable under the concepts enunciated in *Newton, supra.* Each solicitation would stand entirely on its own under the "required evidence" or any other cognizable test. The issue, then, is not one of merger, but of evidentiary sufficiency in light of the nature of the crime of criminal solicitation.

We are, to some extent, in truly virgin territory. We have been neither directed to nor able to locate any reported decision in the United States or in the common law nations of the British Commonwealth precisely on point — determining whether an entreaty to kill more than one person constitutes distinct incitements and thus permits conviction and punishment for more than one act of criminal solicitation. *Compare State v. Furr,* 235 S.E.2d 193 (N.C. 1977), *cert. denied,* 434 U.S. 924, in which the issue was mentioned but not decided, and *see also Regina v. Most,* 7 Q.B.D. 244 (1881), involving a converse situation — a solicitation placed in a newspaper (*i.e.,* a solicitation of many people to perform one act).

We start with the nature of the crime itself. As we pointed out in *Cherry v. State, supra,* quoting from Clark and Marshall, *Law of Crimes* (7th Ed., 1967), the forbidden act in a criminal solicitation is "the accused person's parol or written efforts to activate another to commit a criminal offense." 18

Md. App. at 258. *See also In Re Appeal No. 180, Sept. Term 1976,* 278 Md. 443 (1976). We see no reason why, on the one hand, in a single conversation (much less in two separate conversations as occurred here), a person cannot make successive and distinct incitements, each having a separate object; and we therefore reject the notion that merely because there is but one solicitor, one solicitee, and one conversation, only one solicitation can arise. We similarly reject, however, as being equally simplistic, the "per capita" theory that there are necessarily as many solicitations as there are victims.

Accepting the analogy (although not precisely appellant's interpretation of it) to the allied crime of conspiracy and to the view of it set forth in *Braverman v. United States, supra,* the question of whether there is but one solicitation or several depends upon the circumstances. What, in other words, is the solicitor asking the solicitee to do?

*Braverman* involved a collaboration among several people, extending over a continuing period of time, to unlawfully manufacture, transport, and distribute distilled spirits. Their agreement was to carry on that activity. It so happened that that activity contravened a number of different Federal tax laws, and the conspirators were charged, convicted, and sentenced for multiple conspiracies, one for each specific statute violated. The Court reversed, holding, in effect, that if there is a single agreement, there can be but one conspiracy, even if the overt acts done pursuant to it violate several laws. "The single agreement," said the Court at p. 54 of 317 U.S., "is the prohibited conspiracy, and however diverse its objects it violates but a single statute. . . ."

*Braverman,* of course, but begs the question here. At best, it reinforces the requirement that we focus on the number of incitements and not solely on the number of victims. The number of victims is important only as it may be evidence of the number of incitements. By way of example, an entreaty made by a solicitor to blow up a building in the hope that two or more particular persons may be killed in the blast could be characterized as one solicitation, notwithstanding that implementation of the scheme might violate several differ-

ent laws or, because of multiple victims, constitute separate violations of the same law. The multiple criminality of the implementation would not, in that instance, pluralize the incitement, which was singular. That is the thrust of *Braverman*. But that is quite different from the situation in which the solicitee is being importuned directly to commit separate and distinct acts of murder — to kill, individually, several different specified victims — possibly at different times and places and by different means and executioners. In the latter case, there is not a single incitement but multiple ones, each punishable on its own.

That is the framework within which we must judge this case; and, from the record before us, we find the evidence sufficient to show four separate criminal solicitations based upon four distinct incitements. In point of time, at least three of the incitements were clearly distinct. The deal for the wife was made on May 8; that for Lewis and the two officers was made a week later but in different parts of the conversation. The executions were to occur at different times and places, and possibly by different means and executioners; different (and cumulative) fees were to be paid for these acts. Different motives were involved. Even as between the two officers, the evidence permitted a fair inference that most of these distinguishing attributes were present. In short, the evidence sufficed to permit a finding that it was not a "lump sum" singular deal, but separate and independent incitements to commit four separate and distinct acts of murder against specific named individuals; and thus, neither the separate convictions nor the separate and consecutive sentences were inappropriate.[6]

### (3)

Appellant's last challenge is to the admissibility of the tape recordings made by Mazzone. He asserts that *Massiah v. United States,* 377 U.S. 201 (1964), prevents the

---

6. Appellant has not challenged the validity of the sentences by reason of their length, and we therefore do not consider that matter.

admission into evidence of any conversations between a prisoner and an agent of the State.

This Fifth and Sixth Amendment claim is totally without merit. *Massiah,* and its descendants *Brewer v. Williams,* 430 U.S. 387 (1977), and *United States v. Henry,* 447 U.S. 264, 100 S. Ct. 2183 (1980), involved attempts by the government to gain incriminating evidence from the mouth of an accused with respect to crimes with which he was then charged and upon which he had not been tried. The object, in other words, was to enhance the prosecution already commenced against the accused. This, of course, was not the situation here. In the first place, there were no charges then pending against appellant; he had already been found guilty and was merely awaiting sentence. Moreover, Mazzone was very careful to avoid getting into any discussion pertaining to those offenses, and the record does not reveal that the tapes had any effect whatever on them. Appellant asked a friend to arrange a conversation with a "hitman" for the purpose of committing new crimes, and it was his bad luck that his friend informed the police.

There is no protection afforded under *Massiah* to plans initiated by the appellant for the commission of future crimes. The tapes were properly admitted into evidence.

*Judgments affirmed; appellant to pay the costs.*