489 A.2d 71

**Richard George FRYE**

v.

**STATE of Maryland.**

No. 896, Sept. Term, 1984.

Court of Special Appeals of Maryland.

March 14, 1985.

---

Kathleen Brown, Assigned Public Defender, Baltimore (Alan H. Murrell, Public Defender, Baltimore, on brief), for appellant.

Ann E. Singleton, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, Andrew L. Sonner, State's Atty. for Montgomery County and Stephen J. Savage, Asst. State's Atty. for Montgomery County, Rockville, on brief), for appellee.

Argued before MOYLAN, WILNER and WEANT, JJ.

WILNER, Judge.

Appellant was convicted by a jury in the Circuit Court for Montgomery County of attempted kidnapping, solicitation to kidnap, and solicitation to commit first degree rape, for which he was given concurrent prison sentences of ten years, ten years, and eight years, respectively. All three convictions were based on evidence that appellant had

planned, prepared, induced one Clifford Trageser[1] to assist in, and taken overt acts toward the abduction of Cheryl Allwine for the purpose of selling sexual favors to be performed by her without her consent, against her will, and by force.

Appellant raises three issues in this appeal:

"I.   Should Appellant's convictions on both counts of solicitation be reversed as the Circuit Court for Montgomery County lacked jurisdiction?

II.   Was the evidence adduced at trial legally insufficient to support Appellant's conviction of attempted kidnapping?

III.   Should Appellant's conviction of solicitation of Clifford Tragerser to commit first degree rape be reversed due to variance between facts alleged in the indictment and proof presented at trial?"

We think that the answers to Issues I and II must be in the affirmative. That renders Issue III moot and requires a reversal of the judgments below.

### Background

At some point in late March, 1983, appellant met with Mr. Trageser in the District of Columbia, and, in the course of an unrelated conversation, asked if Trageser knew Ms. Allwine and could locate her. Appellant did not explain why he wanted to find Ms. Allwine; Trageser told appellant he would try to find her.

The two men met again, in the District, during the first or second week of April. Appellant then told Trageser that he had lent Ms. Allwine $400, that she had refused to repay the money, and that he wanted revenge. He laid out for Trageser a plan to kidnap Ms. Allwine and take her to New York where he would "pull a train with her." By that, he

---

**1.**   In portions of the trial transcripts, and in documents in evidence, Trageser is referred to alternatively as "Tragerser" and "Traegeser." When testifying, he spelled his name "T–R–A–G–E–S–E–R."

meant that he intended to invite some friends of his to have sexual intercourse with her and that he would collect the money charged for these acts in payment of the loan. Because appellant did not have a car, he asked Trageser to assist in this venture, which Trageser agreed to do. Specifically, as related by Trageser on cross-examination:

"Q  And it was on that occasion that he asked you to help kidnap her and to help in this pull-the-train business.

A  He asked if I would help him get [Ms. Allwine].

Q  Okay, but you understood that it was to be a kidnapping, didn't you, or a snatch or whatever you call it.

A  Yes, I did.

Q  *And you agreed to do it at that time.*

A  *Yes, I did."* (Emphasis added.)

Trageser, it turned out, was an informant working with the Montgomery County Police Department. He reported this conversation to his county police contact and agreed to "stay in it as it went down and let him know." Continuing, on cross-examination:

"Q  So from then on you planned to participate willingly in this matter, did you not, I mean at least ostensibly willingly as far as [appellant] was concerned.

A  Yes.

Q  So from then on, it wasn't necessary that he asked you to do it *because you had already agreed to do it, hadn't you?*

A  *True."* (Emphasis added.)

Appellant and Trageser had several conversations thereafter, apparently for the purpose of "both of us letting each other know that we were still on it. Nothing had changed." On April 25, appellant called Trageser to let him know that he had finally located Ms. Allwine—"[s]he was to be working that night, and we were going to do it." They arranged to meet that evening at a restaurant in Silver Spring. At that point, according to Trageser, they had already reached an agreement "about what was to happen, but there hadn't been any firm place or date established."

Trageser informed the county police of the meeting. By agreement, he was fitted with a "body wire" which would allow the police to monitor and tape his conversation with appellant. Trageser kept his appointment with appellant; while they were in the restaurant, the county police were on the parking lot listening to and taping the conversation.

A transcript of the taped conversation was admitted into evidence. As supplemented by Trageser's testimony, it shows plainly that the purpose of the meeting was to "finalize" the details of the plan. Appellant had discovered that Ms. Allwine was working as a "go go" dancer at a club in the District. Trageser suggested that he could lure her out to his car between acts by offering her some cocaine. Appellant had with him a drug called "Rush," a set of handcuffs made from rope, a rubber ball, and a pocket knife. He told Trageser, "I'll be ready in the back seat, then you can get together, I put the ball in her mouth and hurt her on the head, boom."

The conversation then turned to where Ms. Allwine would be taken. Initially, appellant had proposed taking her to New York, but he decided ultimately to take her back to his apartment. Trageser reluctantly agreed to that change. They then left the restaurant and headed toward Trageser's car. As appellant was about to climb into the back seat, the police appeared and arrested him.

### Jurisdiction—Solicitation Offenses

Appellant argues that whatever solicitation took place occurred in the District of Columbia, not in Maryland. That is the basis of his jurisdictional argument. The State counters that the inducement made in the District was "nothing more than a vaguely expressed intention" and that it was not until the meeting in Maryland that appellant solicited Trageser "to commit a concrete and detailed plan for criminal action."

Examined closely, the State's response raises two related, but separate issues, namely, (1) was the proposal made in

the District sufficiently clear and criminal to constitute a solicitation, and (2) if so, was the proposal made in Maryland merely an implementation of that earlier solicitation or did it constitute a new, independent solicitation. We need to explore both questions.

■ In *Cherry v. State,* 18 Md.App. 252, 258, 306 A.2d 634 (1973), we adopted the view of common law solicitation set forth in Clark and Marshall, *Law of Crimes* (7th ed., 1967), namely, that the crime "consists of the accused person's parol or written efforts to activate another to commit a criminal offense." Implicit in that, of course, is that, to constitute a solicitation, the proposal must be sufficiently clear to permit a reasonable solicitee to understand, first, what it is he or she is being asked to do, and second, that the achievement of that objective will likely involve the commission of a criminal offense. Without doubt, the proposal made to Trageser in the District satisfies that requirement. Although the precise means and logistics were not then discussed, Trageser understood that he was being asked to assist in kidnapping Ms. Allwine and transporting her, in his car, to a place where she would be gang-raped. *That* is a solicitation. It was complete, it was criminal, it was subject to prosecution, when made.

■ We turn then to what occurred in Maryland. As we concluded in *Cherry,* the gist of the offense is the incitement; the person solicited need not actually commit, or attempt to commit, or even intend to commit the act sought by the solicitor for the crime of solicitation to be committed. *See also In re Appeal No. 180, Term 1976,* 278 Md. 443, 444–45, 365 A.2d 540 (1976); *Gardner v. State,* 41 Md.App. 187, 200–01, 396 A.2d 303 (1979). The solicitation, as we said, is complete when the incitement is made, whatever may be the response to it, or even if there is no response to it. *See State v. Hampton,* 210 N.C. 283, 186 S.E. 251 (1936).

■ That is not to say, however, that the solicitee's response is unimportant. In a case such as this, where the

object of the solicitation is discussed in two or more sequential conversations, it may well be critical in determining whether the subsequent conversation constitutes a new, independent solicitation or merely the detailed planning of the offense already solicited. If the solicitee rejects the first proposal and he is induced again, the caselaw indicates that the second inducement is not merely a continuation of the first solicitation but a new one. *See State v. Furr*, 292 N.C. 711, 235 S.E.2d 193, 202, *cert. denied* 434 U.S. 924, 98 S.Ct. 402, 54 L.Ed.2d 281 (1977):

> "We recognize that . . . a single solicitation may continue over a period of time and involve several contacts where the solicitee gives no definite refusal to the solicitor's request. But a definite refusal on the part of the solicitee plus the lapse of some time may end the transaction so that a new request upon another occasion may constitute a new offense."

■ Conversely, where the solicitee accepts a proposal, sufficient in itself to constitute a solicitation, further discussions aimed at implementing that proposal generally will not be regarded as constituting a new solicitation. So long as the basic objective remains the same, a mere refinement or modification of the means of achieving it ordinarily must be regarded as a furtherance of the earlier solicitation. The evidence shows clearly that the Maryland rendezvous was of that nature. The agreement had been made in Washington; the meeting in Maryland was nothing more than the first stage of its execution.

We conclude that, on this record, there was no solicitation in Maryland. Whether we view that in terms of the court's jurisdiction or simply as an insufficiency of evidence is not important. The judgments entered on counts 2 and 3 of the indictment must be reversed.

### Attempted Kidnapping

An attempt to commit an offense is a common law misdemeanor. We have, on several occasions, defined the crime

as consisting "of an act, done in pursuance of criminal intent falling short of the actual commission of the crime, coupled with at least an apparent ability to commit the intended crime." *Maloney v. State,* 17 Md.App. 609, 636, 304 A.2d 260 (1973), and cases cited therein. In *Gray v. State,* 43 Md.App. 238, 239, 403 A.2d 853 (1979), Judge Moylan rephrased that definition, making explicit an element or requirement that was necessarily implicit in the more traditional definition. Speaking for the Court, he viewed a criminal attempt as consisting of "1) a specific intent to do a criminal act and 2) some act in furtherance of that intent *going beyond mere preparation.*" (Emphasis added.)

Clark and Marshall expound on this requirement. In § 4.06, those authors comment:

"Overt acts by the accused are the outward manifestation of his state of mind and proof of such behavior and intent are essential for establishing a punishable attempt. For practical purposes the quantum and quality of such behavior supplies the index of the actor's state of mind. When an actor's intentional overt acts tend toward the commission of the target crime in such a degree of proximity as to be 'dangerously close' to that target, this type of behavior has been classed as punishable perpetrating action, though the total course of conduct falls short of reaching the target, and the crime aimed at by the accused is unconsummated.

The conception of outward manifestation required for proof of an attempt has been variously delineated as: 'Acts done toward the commission of the intended crime, but falling short of its commission'; '[T]he act done must come pretty near to accomplishing ... [the] result before the law will notice it'; 'A direct ineffectual act done toward its [the crime intended by the accused] commission'; 'The act or acts must come or advance very near to the accomplishment of the intended crime'; 'There must be dangerous proximity to success'; 'If the preparation comes very near to the accomplishment of the act. ...';

'The overt act must be sufficiently proximate to the intended crime to form one of the natural series of acts which the intent requires for its full execution'; 'The performance of some overt act toward its [crime intended] commission....' Proximity to the consummation of the target crime is a matter of degree, ranging from remoteness on one end, to 'dangerously close to success' on the other." (Footnote references omitted.)

■ Clark and Marshall go on to note that there can be no rigid formula for distinguishing between "preparation" and "perpetration" and that each case hinges on its facts. It is clear, however, that there is a spectrum between preparation and completion, and that the overt act necessary to constitute a criminal attempt must be far enough toward the completion as to be outside the penumbral orbit of mere preparation. *See also* 4 *Wharton's Criminal Law* (14th ed., Torcia), § 744 and cases and examples cited therein.

■ The overt act relied upon by the State here is appellant's preparing to enter the back seat of Trageser's car armed with the implements necessary to carry out the kidnapping. That, we think, is far short of what is required; it is mere preparation. Between that act and completion of the kidnapping is the drive into the District to the club where Ms. Allwine allegedly worked, finding her there, luring her outside to the car, and effectively restraining and asporting her. Along the spectrum, appellant was just a hair's breadth off zero.

It is a pity that we must also reverse the judgment on count 1, for that means appellant will go free. There is little doubt that he committed one crime and intended to commit several more. The problem is that the crime he committed was committed in the District, not in Maryland, and, fortunately for Ms. Allwine, he was interrupted before his intended actions became criminal.

JUDGMENTS REVERSED; MONTGOMERY COUNTY TO PAY THE COSTS.