[No. 54287-7-I. Division One. April 10, 2006.]

THE STATE OF WASHINGTON, *Respondent*, v. MITCHELL LEE VARNELL, *Appellant*.

442

*Eric Broman* (of *Nielsen, Broman & Koch, P.L.L.C.*), for appellant.

*Janice E. Ellis, Prosecuting Attorney*, and *Seth A. Fine* and *Charles F. Blackman, Deputies*, for respondent.

¶1 COLEMAN, J. — Mitchell Lee Varnell was convicted of five counts of solicitation to commit murder in the first degree. He contends that his trial lawyers' decision not to have family members testify about his expressions of love for his ex-wife, Karen Varnell, constituted ineffective assistance of counsel, as such testimony could have demonstrated his lack of intent to solicit the murder of Karen, her brother, and her parents. He also makes a "unit of prosecution" challenge to four solicitation convictions that derive from a conversation between himself and an undercover detective. He further argues that these convictions did not arise from separate and distinct criminal conduct and that the sentencing court erred in imposing consecutive sentences. He makes a *Blakely*[1] challenge to the imposition of consecutive sentences. He also argues that his waiver of the

---

[1] *Blakely v. Washington*, 542 U.S. 296, 301, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004).

right to assistance of counsel during his sentencing hearing was invalid. We affirm.

¶2 Testimony by family members about Varnell's expressions of love for Karen would have been duplicative and could have opened the door to the couple's postdissolution and predissolution difficulties. The conversation with the undercover detective supports four solicitation convictions because Varnell solicited the murders of Karen, her brother, and her parents through distinct and separate acts. Because the solicitations involved different victims, the convictions arose from separate and distinct criminal conduct that justifies consecutive sentences. Our Supreme Court's opinion in *State v. Cubias*, 155 Wn.2d 549, 553, 120 P.3d 929 (2005), is dispositive of the *Blakely* challenge. The circumstances of Varnell's decision to represent himself pro se indicate that he understood the risks and the factors of self-representation during sentencing.

## FACTS

¶3 Mitchell Lee Varnell was convicted of five counts of solicitation to commit murder in the first degree. He was given consecutive sentences of 190 months of confinement, for a total sentence of 950 months.

¶4 According to trial testimony, Varnell and Karen divorced after 17 years of marriage. Karen Varnell was awarded custody of their two sons. The divorce was bitter. After the marital dissolution, Varnell hired Mary Wilson to work at his business, Mitchell Excavating. To Wilson, Varnell expressed feelings of anger and love for Karen. He spoke of his hope to reconcile. Wilson noticed Post-It® notes suggestive of a plan to commit a murder. Wilson thought that Mitchell was writing a script or a plot to a movie. But when Mitchell saw that Wilson carried a handgun in her purse, he asked if he could borrow it. She refused. Mitchell then asked if she would be willing to kill Karen for $50,000. She did not think he was serious. Mitchell later asked the same question in the presence of a co-worker. Wilson then

remembered the Post-It® notes. She took them and showed them to Karen Varnell. At the request of the Snohomish County Sheriff's Office, Wilson made a tape-recorded telephone call to Varnell. Wilson told him that she had met a suitable person for carrying out his request and that she would have this person call him to set up a meeting.

¶5 Detective Terence Warren of the Snohomish County Sheriff's Office contacted Varnell under the pretense that he was the man identified by Wilson. They arranged to meet at a restaurant in Everett. At the restaurant, Varnell and Warren had an hour-long conversation that was recorded by the sheriff's office.[2] Varnell told Warren that Karen lived near her parents and brother and that "the way I had it figured originally" was to murder Karen and three other people and dump their bodies in a river. Ex. 16A, at 10. Varnell speculated whether Karen and her parents had alarm systems in their houses. He told Warren he had entered their homes without their knowledge. He also told Warren that "I know that the ways that the wills are set up" and that "depending on what the judge would say, that the grandparents could end up with my . . . kids or her brother." Ex. 16A, at 18. "I don't wanna . . . go part way . . . just to end with my kids even worse off than they are now." Ex. 16A, at 18. Varnell and Warren discussed scenarios in which Warren would kill Karen while she was taking a trip with one son to Idaho or wait for her at her home and murder her there. Varnell then repeated that he wanted Warren to kill Karen, her parents, and her brother at the same time. "I'd preferably . . . want it to look like [an] accident," possibly by placing them in a car and running the car into a river so that they would drown. Ex. 16A, at 35.

¶6 The Sheriff's Office arrested Varnell immediately after the conversation. He was charged with one count of solicitation for his conversations with Wilson and four

---

[2] At trial, an audio recording of this conversation was entered into evidence and played for the jury. A transcript of the recording was numbered exhibit 16A. The transcript was not entered into evidence, but copies were given to jurors to assist them in listening to the recording.

counts of solicitation for his taped conversation with Warren.

¶7 During trial, the State offered into evidence a 10-minute segment of a videotape record of the meeting between Varnell and the undercover detective to show how Varnell appeared. Varnell's counsel cross-examined the witness for the videotape. The witness acknowledged that the videotape did not show that when Varnell initially arrived at the restaurant, he turned and walked back to the parking lot and that Warren came out of the restaurant and chased him down.

¶8 Varnell's trial counsel presented the expert testimony of Dr. August Piper, a psychiatrist. Piper had reviewed Varnell's medical history and a transcript of the meeting with Warren and had spoken with Varnell for about 11 hours. Piper testified that Varnell had a personality disorder and that he suffered an "erotomanic" delusional disorder. Piper described the latter disorder as a belief that Karen "is still in love with him, and loves him passionately, and, you know, there's just a huge amount of evidence against that belief and yet he continues to hold it despite all this evidence against it." Verbatim Report of Proceedings (VRP) (July 11, 2003) at 403.

¶9 On cross-examination, the State questioned Piper about the dependence of his diagnosis on information provided to him. Piper testified that he relied upon police reports, including a report of a violation by Varnell of a no-contact order or a restraining order when he tried to give Karen flowers or balloons outside a supermarket.

Q. Now, but a large part of your diagnosis was based on the representations of Mr. Varnell; correct?

A. . . . The short answer to your question is yes, a large part was based upon my interactions with him and what he told me, yes.

Q. And I believe you indicated earlier to Mr. White that the validity or accuracy of your diagnosis is dependent on the accuracy of the information you receive?

A. As with any physician, including psychiatrists, yes.

Q. Right. And certainly, you know, garbage in, garbage out sort of thing; correct?

A. Well, in psychiatry we are especially dependent upon what the patient, the person tells us. In other branches of medicine, like when I was practicing internal medicine, you know, if I wanted to find out what was really going on I could get blood tests, or urine tests, or X-rays, or whatever, but there are no such diagnostic tests available in psychiatry. So we are crucially dependent upon what the patient tells us.

VRP (July 14, 2003) at 422.

¶10 Varnell testified in his own defense. He stated that when he agreed to talk to the man recommended by Wilson, he "wanted to catch this guy and get him caught by the police for the things he was saying so that I could show Karen how much I still loved her and that there was no way that I would ever do anything to hurt her by catching this potential bad guy." VRP (July 14, 2003) at 472. Varnell also testified that he believed Karen loved him and they were going to reconcile.

¶11 The jury found Varnell guilty of all five counts. Varnell hired new counsel, John Muenster, and moved for a new trial on multiple grounds, including ineffective assistance of counsel.

¶12 At a hearing on the motion, one of Varnell's trial counsel testified that Varnell had wanted several additional people to testify, primarily as to Varnell's character or to issues related to his divorce, but that he and the other counsel believed that this testimony would not be productive and might be counterproductive. He also testified that he did not want family members to testify about Varnell's love for Karen because this evidence was already presented through Varnell himself, because interviews with the family members led to inconsistent facts, and because he did not want to "open the box of the divorce to allow all of that evidence to come in." VRP (Feb. 27, 2004) at 48. He stated that the "nastiness from the divorce" included "terrible declarations" and "allegations that he was physically abu-

sive to the wife, that he pointed a gun at her, knocked her off a horse, a lot of stuff." VRP (Feb. 27, 2004) at 49. During argument on the motion, the State contended that it would have welcomed this testimony because it would "open the door . . . to the divorce box" as rebuttal evidence. VRP (Feb. 27, 2004) at 98. The motion was denied.

¶13 Varnell communicated to the court that he wished to fire Muenster as his counsel. A hearing took place on March 15, 2004, and Varnell told the court that he had "no reason to believe Mr. Muenster can represent me." VRP (March 15, 2004) at 9. Muenster informed the court that he would prefer to represent Varnell during sentencing.

> I think it's very important that he be represented by a lawyer in his sentencing, because there's an extremely significant issue, and that is whether the consecutive sentence policies in the [Sentencing Reform Act of 1981, chapter 9.94A RCW,] are overly harsh and whether an exceptional sentence downward is warranted, because otherwise, the sentence range for Mr. Varnell gets to be longer than I think I've ever seen in my practice outside of an aggravated murder case.

VRP (Mar. 15, 2004) at 9-10.

¶14 The court told Varnell that it believed that Muenster was correct about the importance of having representation. It repeatedly asked Varnell whether he wished to represent himself, but Varnell would not give a clear "yes" or "no" answer. The court recessed while Varnell conferred privately with Muenster. The court again asked Varnell whether he wished to have Muenster represent him. Varnell did not give a clear response but instead replied, "You can just use your judgment" and "You can make your decision." VRP (Mar. 15, 2004) at 20. When Varnell told the court that he was "confused at this point," the court interrupted him and stated, "Mr. Varnell, I don't believe you are confused. I think you know exactly what is going on here. I think what you want is to have it both ways. That's not possible. Mr. Muenster will continue to represent you." VRP (Mar. 15, 2004) at 20.

¶15 A sentencing hearing was set for the next month. Muenster filed a brief arguing that the four solicitation convictions from the conversation with Warren should not be deemed separate and distinct criminal conduct and that an exceptional sentence below the standard range should be imposed.

¶16 At the hearing, Varnell informed the court that Muenster was no longer his counsel. The following conversation took place:

> THE COURT: . . . If you do not wish to have Mr. Muenster represent you any further at this particular proceeding. We can address that issue. *We've already discussed some of the advantages to you of being represented.* In fact, I think those issues have been discussed with you by a number of judges by now. Mr. Muenster has already submitted a brief on your behalf about whether or not the Court should consider a mitigated sentence. I would assume that Mr. Muenster is prepared to also present some argument on that issue, as well as whatever ruling the Judge, that is, myself, might make on that point, he's also prepared to make an argument on your behalf as to an appropriate sentence, whether it's a mitigated sentence or standard range sentence. As an attorney, he obviously has more knowledge than you of the law. He can present those arguments on your behalf. You still have a right of allocution on sentence to address the Court on your appropriate sentence. My question is to you, do you want Mr. Muenster not to participate any further in these proceedings?
>
> THE DEFENDANT: I want him to—well, I guess the question I have for you, Your Honor, have you already made a decision—
>
> THE COURT: I don't know that that has any bearing on the question of whether or not you wish to be represented, Mr. Varnell.
>
> THE DEFENDANT: I do not wish to be represented by Mr. Muenster.
>
> THE COURT: *As I said, courts have gone over this several times with you about your rights to have representation or your right to represent yourself. You understand the issues there; right*? You understand, if you do not wish to have Mr. Muenster

participate any further on your behalf or to represent you, then I am going to take into account the brief he's already filed, but he's not going to address the Court further, I guess, if that's what you wish.

. . . .

THE COURT: . . . I simply want to know, and I think you know enough about these issues, I feel you're adequately advised already about the issues about representing yourself. I want an unequivocal answer one way or the other, do you want Mr. Muenster to represent you at this sentencing proceeding?

THE DEFENDANT: No, I do not, Your Honor.

THE COURT: I'll instruct Mr. Muenster that he is not [to] present any further arguments or presentations on your behalf during this proceeding.

VRP (April 19, 2004) at 7-10 (emphasis added). Later in the hearing, Varnell asked for a lighter sentence. "Basically, I feel the same way, even though Mr. Muenster is not representing me, I've read his brief and I feel as such in the same opinion as pertaining to what is specified in that brief, and the direction of a sentencing procedure." VRP (Apr. 19, 2004) at 15. He also asked that the sentences run concurrently and that the sentences be reduced to time served.

¶17 Varnell was sentenced to 190 months of confinement for each count to run consecutively, for a total confinement of 950 months. He appeals.

## ANALYSIS

■ ¶18 We begin by examining Varnell's claim that his trial counsel rendered ineffective assistance by deciding not to introduce testimony by family members about his pre-arrest declarations of love for Karen. "To prevail on a claim of ineffective assistance of counsel, counsel's representation must have been deficient, and the deficient representation must have prejudiced the defendant." *State v. Aho*, 137 Wn.2d 736, 745, 975 P.2d 512 (1999) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). To prove deficient performance, a defendant

must establish that the representation fell below an objective standard of reasonableness under professional norms. *State v. Thomas*, 109 Wn.2d 222, 226, 743 P.2d 816 (1987).

¶19 Varnell contends that his trial attorneys received information before trial that he expressed his love for Karen in the weeks before the arrest but they failed to investigate this information or introduce it at trial. He argues that such action falls below an objective standard of reasonableness and, therefore, constitutes deficient performance. A presumption of competence can be overcome "by showing counsel failed to conduct appropriate investigations to determine what defenses were available, adequately prepare for trial, or subpoena necessary witnesses." *State v. Maurice*, 79 Wn. App. 544, 552, 903 P.2d 514 (1995). He further contends that such testimony would have supported his argument that he never intended to solicit the murder of Karen or her family and that the absence of this testimony was prejudicial. He argues that such testimony would have bolstered the testimony of Piper, who was subject during cross-examination to a "garbage in, garbage out" challenge to his reliance on Varnell's postarrest statements. He also argues that such testimony would not have opened the door to his actions toward Karen before the dissolution of their marriage.

¶20 We conclude that counsel's decision not to investigate or introduce into evidence testimony by Varnell's family members and friends of his declarations of love for Karen was a legitimate and intelligent trial tactic. Assuming that these out-of-court statements were admissible, such testimony would have enabled the prosecution to cross-examine those witnesses about the postdissolution difficulties between Varnell and Karen and might have opened the door to predissolution difficulties. Furthermore, such testimony was duplicative of Wilson's testimony about Varnell's prearrest statements of love for Karen and his hope for reconciliation. Because the decision not to offer this testimony was a legitimate trial tactic, it does not support a claim of ineffective assistance of counsel.

■■ ¶21 We next analyze Varnell's claim that the four convictions arising from the conversation between Varnell and an undercover detective violate double jeopardy under a unit of prosecution analysis. The double jeopardy clause of the Fifth Amendment and the state constitutional rule against double jeopardy protect a defendant from being punished multiple times for the same offense. *State v. Adel*, 136 Wn.2d 629, 632, 965 P.2d 1072 (1998). "The proper inquiry in this case is what 'unit of prosecution' has the Legislature intended as the punishable act under the specific criminal statute." *Adel*, 136 Wn.2d at 634. Washington's Criminal Code provides that a person has committed criminal solicitation "when, with intent to promote or facilitate the commission of a crime, he offers to give or gives money or other thing of value to another to engage in specific conduct which would constitute such crime . . . ." RCW 9A.28.030(1). "A person is guilty of murder in the first degree when . . . with a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person . . . ." RCW 9A.32.030(1)(a).

¶22 Varnell argues that his statements during the taped conversation with the undercover detective can support only one solicitation conviction. He argues that the proper unit of prosecution for solicitation is an incitement and that he made only one incitement during his conversation with the undercover detective. For support, he cites *State v. Bobic*, 140 Wn.2d 250, 996 P.2d 610 (2000), in which our Supreme Court ruled that under a unit of prosecution analysis, the focus for criminal conspiracy is the conspiratorial agreement, not the criminal object or objects. *Bobic*, 140 Wn.2d at 265. *See also People v. Morocco*, 191 Cal. App. 3d 1449, 1453, 237 Cal. Rptr. 113 (1987) (holding that the crimes of solicitation and conspiracy share similar conceptual underpinnings). We disagree with his argument.

■ ¶23 While the inchoate crimes of solicitation and conspiracy have many similarities, the proper unit of prosecution for solicitation of murder is not an overall agreement or incitement but each solicitation for conduct con-

stituting a murder. Because the crime of murder is victim specific, the crime of solicitation to commit murder, directed to a specific individual, is likewise victim specific. Varnell proposed that the undercover detective invade the separate residences of Karen, her brother, and her parents, with multiple possibilities for alarm systems and other safety measures, and abduct them in separate and distinct acts so they could be brought to a central location or vehicle. Although Varnell's proposal derived from a single plan with a single motive, it still encompassed solicitations of four distinct courses of conduct leading to four murders.

¶24 This situation is analogous to the circumstances of *Meyer v. State*, 47 Md. App. 679, 689, 425 A.2d 664 (1981), in which the Maryland Court of Appeals upheld four solicitation convictions arising from two conversations because the solicitations occurred at different parts of the conversations and because they involved separate and distinct acts of murder. *Meyer*, 47 Md. App. at 690. Because Varnell's plan contemplated the abduction of the four people from their residences to be murdered elsewhere, it is distinguishable from the circumstances of *Morocco*. There, the appellate court ordered stricken one of two solicitation convictions arising from a request for the murder of a husband and wife living in the same residence at the same time, presumably by the same means. *Morocco*, 191 Cal. App. 3d at 1454.

¶25 Affirmed.

¶26 The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions.

Baker and Ellington, JJ., concur.