*Aaron Lamont Brice v. State of Maryland*, No. 1537, September Term, 2021. Opinion by Harrell, J.

**CRIMINAL LAW – SUFFICIENCY OF THE EVIDENCE – SOLICITATION TO COMMIT FIRST-DEGREE MURDER**

The State satisfies its burden of evidentiary sufficiency when "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Kamara v. State*, 205 Md. App. 607, 632 (2012) (quoting *State v. Coleman*, 423 Md. 666, 672 (2011). After a bench trial, Appellant was convicted of solicitation to commit first-degree murder. To prove that a defendant solicited the commission of first-degree murder, the State must prove that: (1) that the defendant urged, advised, induced, encouraged, requested, or commanded another person to commit first-degree murder; and (2) that at the time the defendant made the oral or written efforts to persuade another person to commit first-degree murder, the defendant intended that the first-degree murder be committed. *See* MPJI-Cr 4:31.

The State's evidence centered on a recording of a telephone call that Appellant placed from jail. Appellant placed that call to the solicitee the day after Appellant was convicted of numerous crimes against the victim, his former love interest. During the call, Appellant told the solicitee: "Shoot that bitch up."

At trial, Appellant's counsel argued that the context of the conversation heard on the call showed that Appellant was directing the solicitee to shoot a brown car parked in a lot outside the victim's apartment. The State claimed that Appellant's references to that vehicle were coded references to the victim's location. The trial court found that Appellant used the brown car as a landmark for the solicitee to find the victim, and that the jail call contained a thinly veiled solicitation to commit first-degree murder.

The evidence established that Appellant directed the solicitee to "[s]hoot that bitch up." Later in the conversation, the solicitee asked: "What you want, me to fire that bitch up?" Appellant responded: "Yeah." Based on those statements — and all of the other evidence — the court was able to infer reasonably that Appellant asked the solicitee to kill the victim, rather than shoot at a vehicle outside the victim's apartment. Moreover, the trial court did not err in relying on evidence extrinsic to the solicitation in concluding that Appellant was guilty of solicitation to commit first-degree murder.

Circuit Court for Anne Arundel County
Case No. C-02-CR-21-000944

AARON LAMONT BRICE

v.

STATE OF MARYLAND

Berger,
Friedman,
Harrell, Glenn T., Jr.
   (Senior Judge, Specially Assigned),

JJ.

Opinion by Harrell, J.

Filed:  December 22, 2022

*Ripken, Laura S., J., did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

**At the 8 November 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on 14 December 2022.

"What we've got here is failure to communicate."

> The Captain (portrayed by Strother Martin) in "Cool Hand Luke" (1967).

In this case, a trial judge in the Circuit Court for Anne Arundel County disagreed implicitly that this quotation applied to the defense's essential theory. In a bench trial in November 2021, the defendant, Aaron Lamont Brice, argued that the text of a telephone call he made from jail did not communicate a solicitation to murder a specific person. The court found him guilty. The judge sentenced Brice to 25 years, suspending all but 15 years, consecutive to any outstanding sentence, and five years of probation. Brice appeals timely and presents a single question for our review:

> Was the evidence insufficient to sustain Appellant's conviction for solicitation to commit first-degree murder?

For reasons we shall explain, we affirm the judgment of the circuit court.

## BACKGROUND

The State's case focused on a telephone call Brice made to Alton Michael Logan Rivera while Brice was in jail. Brice placed that "jail call" the day after he was convicted of numerous crimes against Lauren Friedlieb, his former love interest. During the jail call, Brice told Rivera: "Shoot that bitch up." The State contended that Brice instructed Rivera during the call to shoot and kill Lauren.[1] Brice's attorney argued that the context of the conversation heard on the jail call showed that Brice actually was directing Rivera

---

[1] We refer to the victim as "Lauren," to avoid confusion with her father, Frank Friedlieb, whom we refer to as "Frank."

to shoot a vehicle parked in a lot outside Lauren's apartment. The State claimed that Brice's references to that vehicle were coded references to Lauren's location so that Rivera could locate and shoot Lauren.

After opening statements, the court admitted into evidence the parties' stipulation as to the prior convictions that had Brice in jail the day before he placed the jail call to Rivera. That stipulation was entered into evidence as a joint exhibit:

1. A two-day trial was held on March 8, 2021 and March 9, 2021, and the Defendant was found guilty of forty-two counts in the District Court for Anne Arundel County, listed chronologically by offense date:

   i. One Count of Assault in the Second Degree . . . involving the Defendant assaulting Lauren Friedlieb in her home, . . . on January 22, 2020 at approximately 2:00am;

   ii. One Count of Violation of Protective Order . . . involving the Defendant sleeping against the front door of [Lauren's home] on January 22, 2020 at approximately 1:37pm;

   iii. One Count of Violation of Protective Order and One Count of Violation of Release Condition . . . involving the Defendant observed by officers on January 22, 2020, at 11:45pm in front of the balcony at [Lauren's home], yelling for Lauren Friedlieb up to her balcony in violation of Pre-Trial Release Conditions and an Interim Protective Order;

   iv. One Count of Violation of Protective Order . . . involving Ring footage from January 23, 2020 at 2:13am and 2:34am that captured the Defendant kicking the front door at [Lauren's home], in violation of a Protective Order;

   v. One Count of Violation of Protective Order . . . involving the Defendant calling Lauren Friedlieb from the Anne Arundel County Detention Center on January 26, 2020;

   vi. One Count of Motor Vehicle Unlawful Taking, One Count of Unauthorized Removal of Motor Vehicle, One Count of Theft: $25,000 to $100,000, and One Count of Violation of Protective

Order . . . involving Lauren Friedlieb's surveillance from February 1, 2020 capturing the Defendant entering her 2018 White Volkswagen Atlas ("Atlas") from the parking lot beneath her balcony at [her home] in violation of the Interim Protective Order. The Atlas was later recovered in the lot adjacent to . . . the townhome of Frank Friedlieb, the victim's father;

vii. Twelve Counts of Violation of Protective Order and One Count of Violation of Release Condition . . . involving the Defendant calling Lauren Friedlieb approximately 128 times on her cell phone between 11pm on February 1, 2020, and 11:30am on February 2, 2020, in violation of the Final Protective Order;

viii. Eighteen Counts of Violation of Protective Order . . . involving the Defendant contacting Lauren Friedlieb personally and via third parties (at his direction from the jail) via social media messages, text messages and calls to her personal cell, and calls to her employment from February 9, 2020, to August 21, 2020;

ix. One Count of Violation of Protective Order . . . involving the Defendant calling Lauren Friedlieb on her cell phone in violation of the Final Protective Order on August 19, 2020; and

x. Two Counts of Violation of Protective Order . . . involving the Defendant utilizing the jail call system to direct a third-party to contact Lauren Friedlieb via text message on September 5, 2020, in violation of the Final Protective Order.

2. Lauren Friedlieb was the victim in the cases above and testified in all cases.

The State's first witness at Brice's trial for solicitation to commit murder of Lauren was Detective Shelton Jones, Jr. of the Anne Arundel County Police Department. On 10 March 2021 — the day after Brice was convicted in the District Court in the earlier cases — the State's Attorney's Office contacted Detective Jones about a jail call that Brice had made. During his investigation, Detective Jones obtained call logs for an inmate named Robert Davis, on whose jail account the calls were made by Brice. During

3

one jail call, Brice called an unknown individual and directed that individual to contact

Brice's mother and request that she deposit money into Robert Davis's account at the jail:

[BRICE]: "Do me a favor."

FEMALE VOICE: "What?"

[BRICE]: "Text my mom real quick."

FEMALE VOICE: "And say what?"

[BRICE]: "Say 'Aaron said put 50 on Robert Davis' phone account."

FEMALE VOICE: "You should have copied a message that you (indiscernible – 10:32:44) before."

[BRICE]: "What? Put 50 on his account and 50 on my commissary. You got the name Robert Davis?"

FEMALE VOICE: "Uh-uh."

[BRICE]: "Huh?"

FEMALE VOICE: "No, Robert Williams."

[BRICE]: "No. Robert Davis."

FEMALE VOICE: "On your account for commissary?"

[BRICE]: "Yeah, 50 and 50 on my account for commissary. Yeah. Because I'm trying to call mom back because I'm trying to get her to call this lawyer. I need a good -- a need a lawyer (indiscernible – 10:33:24). I fucking have to, yo. But I don't know. I'm a -- are you all right?"

Brice then called Alton Michael Logan Rivera, using Davis's caller identification. That

jail call included the following exchanges:

[BRICE]: "Hello?"

[RIVERA]: "Whoa. What's cracking, cuz?"

4

[BRICE]: "Ain't shit. What's up, bro? What you doing? (Indiscernible)."

[RIVERA]: "Not shit. Fuck going on?"

[BRICE]: "Nothing, man. I'm on some bullshit. I need you to take care of something."

[RIVERA]: "Yo. What's good, shorty?"

[BRICE]: "This shit crazy. Like, (indiscernible). Oh, just -- you need you to handle something, bro."

[RIVERA]: "All right. What's good?"

[BRICE]: "Man, over at my old crib. Like, man -- I'm trying -- I can't remember what my -- what my -- what my, uh -- what my -- what my, uh baby mama ex[2] live at, right in Crofton down by the where I used to live at."

[RIVERA]: "Uh-huh."

[BRICE]: "Down by where I used to live at. That's why I called you off another ID, but that's where her house is at. Almost -- I know here's where she live at and she got this brown car now, right?"

[RIVERA]: "Uh-huh."

[BRICE]: "Shoot that bitch up."

[RIVERA]: "Oh, really?"

[BRICE]: "Like, you know where the elementary school is, right?"

[RIVERA]: "Yeah."

[BRICE]: "It's across from there. If (indiscernible), that joint across from it."

[RIVERA]: "You said she got a brown car?"

---

[2] Brice was not the biological father of Lauren's child.

[BRICE]: "Yeah. It's a brown Chrysler. All right. And I'm going to give you the address."

[RIVERA]: "All right. Shit, you're going to have to give me a minute. I'm playing the game."

[BRICE]: "Oh, you playing a game?"

[RIVERA]: "Nah. Yeah, I got to get the address down in a second."

[BRICE]: "You stay playing the game."

[RIVERA]: "Oh, yeah."

[BRICE]: "Yeah, please take care of that of that, bro. I got you when I get home. Like, they done found me guilty on every fucking thing yesterday, bro."

[RIVERA]: "How? Oh, yeah. I (indiscernible)."

[BRICE]: "I went to trial yesterday. (Indiscernible)" --

[RIVERA]: "I'll get the addy now."

[BRICE]: (Indiscernible).

[RIVERA]: "What's the addy? Like, what's the addy?"

[BRICE]: "2905."

[RIVERA]: "Hold up. It slipped out."

[BRICE]: "Cold Spring."

[RIVERA]: "Huh?"

[BRICE]: "Cold Spring Way."

[RIVERA]: "Old Friend?"

[BRICE]: "No, Cold Spring Way."

[RIVERA]: "Oh, Cold Spring Way."

[BRICE]: "The joint, the apartment is 453, right. But what you do is like if you come on the side like across from like -- like, if you see -- if you come on the -- you know there's two entrances, right? There's" --

[RIVERA]: "Yeah."

[BRICE]: -- "one directly across from the elementary school. There's the one like that's like before the elementary school."

[RIVERA]: "Uh-huh."

[BRICE]: "All right. Come in the back side, but like across from the elementary school and go around. It's like -- it's like -- you'll see the first, the front of it, then you'll see the middle part, then you'll see like the -- the -- like the parking lot is on the right."

[RIVERA]: "Uh-huh."

[BRICE]: "And it's like -- it's like a -- I don't know. If you got the address, it'll take you straight to it."

[RIVERA]: "All right. You said it's a brown joint?"

[BRICE]: "Yeah. Yeah. You'll see it. It's like a brown Chrysler."

[RIVERA]: "But I mean, there's hella [a lot] brown Chryslers, but I'll look."

[BRICE]: "Nah, but it won't be. It's the only one. It's like -- trust me, you'll know because it's right under like the balcony part. Like, right -- it's always there."

[RIVERA]: "All right. So yeah, I'm going to scope that joint out in a little bit and" --

[BRICE]: "Yeah, she is" --

[RIVERA]: -- "see if she's there. I can't" --

[BRICE]: "Yeah, she's -- she's not there now, but if you go around there around like 5:00, 6:00, she'll be there. The car will be there."

7

[RIVERA]: "All right."

[RIVERA]: "All  right. You're saying" --

[BRICE]: "But if not, if not, if you don't see it there, right" --

[RIVERA]: "Uh-huh."

[BRICE]: "Well, Bop told me to say he loves you, let you know he's taking care of some business. I know he's trying to get some drugs, but -- all right. All right. But if you -- if it's not there, right, when I call you back, all right" --

[RIVERA]: "Uh-huh."

[BRICE]: -- "her people live in the townhouses houses on Jessie Drive across from it."

[RIVERA]: "All right."

[BRICE]: "And it's like a -- I think it's like 1184 Jessie Drive, but" --

[RIVERA]: "1184 Jessie Drive? All right."

[BRICE]: "Yeah, yeah. But it's like -- it's not the first, second -- it's like the third left as soon as you turn on Jessie[3] Drive. You know (indiscernible)?"

[RIVERA]: "If I" --

[BRICE]: "Huh?"

[RIVERA]: "If I don't see it, if I don't see it today, can I see that bitch tomorrow?"

[BRICE]: "Yeah, yeah. Yeah, I know. But I'm saying like you know -- like, if you know where the -- you know on the side where 7-Eleven is right?"

[RIVERA]: "Well, damn. That's a little bop for me."

---

[3] At trial, the parties appeared to understand this as "Jeffrey Drive," not Jessie Drive.

[BRICE]: "No, it's not."

[RIVERA]: "The 7-Eleven? I live in the Meadows."

[BRICE]: "No, listen. The 7-Eleven besides Golds Gym and all that."

[RIVERA]: "Yeah, man. It's not a bop, but it's a cool little minute."

[BRICE]: "Is it?"

[RIVERA]: "I mean, not really. Nah. Nah, go ahead. Yeah. I know what you're talking about."

[BRICE]: "Yeah. Okay. Okay. Well, it's just like literally it's the development across from like, like 7-Eleven. Like, (indiscernible)."

[RIVERA]: "Yeah, where the -- I know what you're talking about, the apartment joints."

[BRICE]: "No. No, that's the -- yeah, that's where I live at. That's where I live at."

[RIVERA]: "Oh, all right."

[BRICE]: "And that's what I'm telling you about, but this is like -- it's like before the 7-Eleven if you're going towards like Golds Gym. It's on your right. That's Jessie Drive."

[RIVERA]: "All right. I (indiscernible)" --

[BRICE]: "Well, all right. But" --

[RIVERA]: -- "(indiscernible) to it."

[BRICE]: "All right. All right. Well, you'll see like a black Volkswagen and then it's like a gray Volkswagen right, with like New York plates on it. And yo, and there'll be a Passat right there."

[RIVERA]: "Uh-huh."

[BRICE]: "And then there's be beside like a Toyota Tundra. Like an all white Toyota Tundra."

9

[RIVERA]: "What you want, me to fire that bitch up?"

[BRICE]: "Yeah."

[RIVERA]: "All right. If not, then I'm just going to slash wheels.[4] I'm going to something about it."

[BRICE]: "All right. My n[****]. All right. We going to call you. Bop said he going to call you in a little bit. All right?"

[RIVERA]: "All right. See ya. Y'all n[****] be safe. Yeah, tell him I love him."

[BRICE]: "All right. All right. Love you too, yo. I love you. I appreciate you."

[RIVERA]: "All right, yo."

[BRICE]: "All right."

[RIVERA]: "Tell him I love him and I love you too, cousin. Be safe through everything."

Detective Jones testified that this call originated from the Anne Arundel County Detention Center and that the individuals on the call were Brice and Rivera. Detective Jones testified about his response upon learning of the call:

[STATE:] Okay. And based on what you heard in that call, what was your response?

[DETECTIVE JONES:] My response to that was one, to go to the address that was mentioned in the call and try to locate the victim, or potential

---

[4] During closing argument, the State argued:

    We actually do dispute the "slash" portion. I liste[ne]d to that point, 7:02. Seven minutes and 2 seconds. If the Court wants to hear it again, I listened to it about a thousand times during lunch, I did not hear a slash. I hear "slide through," whatever the kids are saying these days.

victim, to one, ensure that she was okay and if she didn't live at that address anymore, make sure that the people at that address were aware of what was going on, so they would be okay.

* * *

[STATE:] Okay. So after you met -- after you went and saw Laur[en] Friedlieb, what other investigative steps did you take?

[DETECTIVE JONES:] From that point, I listened to the jail calls and contacted Ms. Friedlieb, spoke to her briefly, asked her different questions in reference to the type of vehicles that she or her family previously owned . . . and exactly where she previously lived at.

Detective Jones executed a search and seizure warrant at Rivera's home. Detective Jones tried to speak with Brice at the Jennifer Road Detention Center, but Brice refused the audience.

During Lauren's testimony, she confirmed her address and apartment number. About two months before Brice called Rivera, Lauren had moved from the apartment that Brice described in the call. At the time of Brice's call to Rivera, Brice had been incarcerated at the Anne Arundel County Detention center for about a year. Lauren testified about the circumstances of her move: "[N]obody knew that I had moved. . . . I had to end my lease early and show them all the paperwork from court about the abuse and the ongoing disputes . . . and they let me leave my lease early and I had to find somewhere else to live very quickly[.]"

Rivera testified at trial and admitted to taking Brice's call. Rivera claimed initially, however, that he did not recognize the voices on the recording of the jail call. During cross-examination by Brice's counsel, Rivera admitted that his voice was on the recording of the jail call. Rivera testified that he did not recall writing down an address.

11

He claimed also that he had never met Brice and that he did not know who Brice was. Nevertheless, Rivera asserted:

> [BRICE'S COUNSEL:] And sir, . . . you said the words, "You want me to fire that bitch up;" is that correct?
>
> [RIVERA:] Yes, sir.
>
> [BRICE'S COUNSEL:] And isn't it true that when you said that, you meant you were going to vandalize it, shoot it up, to a car, correct?
>
> [RIVERA:] Correct.

Frank Friedlieb testified that Brice's reference in the jail call to "1184 Jessie Drive" was an incorrect reference to Frank's address:

> [STATE:] What was familiar about what was said in that call?
>
> [FRANK FRIEDLIEB:] If she wasn't there, where -- to come to 1128,[5] over there my residence.

Frank testified also about the significance of the "third left" that Brice referred to in the jail call:

> [STATE:] I believe the caller states something about a third left. Does that have any significance to you?

---

<sup>5</sup> Regarding the address that Brice referenced in the jail call, the court found as follows:

> He misidentifies, I think, the parent's address. I think he's off by 60. He says 1184 and I think it was 1124. He says it's the third left and really it was the second left.
>
> But Ms. Friedlieb said he had never been there or at least she had never take[n] him there. So it would be understandable if he was a bit off as to exactly what the street number was or exactly which turn you were to make.

12

[FRANK FRIEDLIEB:] It does. I mean, if we -- we were actually on the left -- we're on the second left, when we come into the court. The third left actually was where we discovered that [Brice] left our vehicle that he stole.

\* \* \*

[FRANK FRIEDLIEB:] As far as the vehicle being stolen, it was stolen from in front of [Lauren's] apartment. . . . At that time, when -- I didn't know nothing about Mr. Brice or anything about that. She called to let me know the truck was stolen, and -- . . . It was a 2017 . . . Volkswagen Atlas.[6]

\* \* \*

At the time when I got the phone call, I didn't know. My wife woke me up, said, you know, my daughter called saying the truck was stolen. We didn't know anything what was going on at that point. Got to her house, and then she started telling us about what was going on with Mr. Brice and all.

I proceeded to give Mr. Brice a call and let him know that the truck was not my daughter's, it was mine. Just bring it on back, and you know, we'll let everything go on that part.

When Frank called Brice about the stolen Volkswagen Atlas, Brice denied having possession of the vehicle. As a result, Frank contacted the police. Mysteriously, the car was found in Frank's development in "[t]he third court on the left[.]"

Frank explained that his wife drove a Volkswagen Jetta that did not have New York plates, but did have a New York Yankees license plate frame. Frank testified that he drove a white Toyota Tundra. During the jail call at the core of this case, when Brice was providing Rivera with landmarks to find Lauren's family's home, Brice stated as follows:

---

[6] Frank testified that the Atlas was a white SUV.

13

it's like the third left as soon as you turn on Jessie Drive. . . . [Y]ou'll see like a . . . Volkswagen . . . with like New York plates on it. . . . And then there's be beside like a Toyota Tundra. Like an all white Toyota Tundra.

Back to Lauren's testimony, she stated that she had never met Rivera, and she did not recognize Rivera's voice on the jail call. Lauren said that Brice would call her "[b]aby mom," even though they have no children together. Lauren and Brice were involved romantically and lived together, with Lauren's toddler, for about a year at her previous apartment in Crofton. Beneath that apartment, there was a brown, "goldish-tan," "abandoned" Chrysler "that never moved." Lauren identified that car in a photograph at trial. As to Brice's references in his jail call to a "brown Chrysler . . . right under like the balcony part" that was "always there" and to the part of the call in which Brice tells Rivera "if you go around there around like 5:00, 6:00, she'll be there[,]" Lauren explained: "It's exactly where the car is parked and then that's basically the time I get off from work and after I pick up my son from daycare." Lauren observed that nobody in her family had a brown car. And nobody with whom she had any relationship had a brown car.

At the end of the trial, the court ruled as follows:

> So the Court is left to answer the questions that counsel has put to the Court very directly, what does "Shoot that bitch up" mean? What does "fire that bitch up," mean? I think there is sufficient evidence of that Mr. Brice did intend Mr. Rivera to murder Ms. Friedlieb and that his -- that he had sufficient premeditation.

> I'll just go over briefly the Davis commissary, the $15 bucks or $50 bucks, whatever it is, so that he can use another inmate's ID to call out so that he's not going to be detected. That is to quote the jail call. Pretty clever. Maybe not clever enough.

14

When he makes the jail call then he asks Rivera or directs Rivera, as I behold the evidence, using very precise landmarks. He may have been asking him to do more than a murder. He may have been asking him also to mess up some cars at the parent's house. He may have been asking or communicating with Mr. Rivera about some drugs in and out of the detention center having to do with their mutual friend, but those matters are not really before me today.

Again, I find that the evidence is persuasive that the Defendant directs Rivera using very precise landmarks although they're not always accurately described. Again, New York plates not quite the same as having a New York Yankees license frame. He misidentifies, I think, the parent's address. I think he's off by 60. He says 1184 and I think it was 1124. He says it's the third left and really it was the second left.

But Ms. Friedlieb said he had never been there or at least she had never take[n] him there. So it would be understandable if he was a bit off as to exactly what the street number was or exactly which turn you were to make.

Mr. [Br]ice . . . describes the residence, gives him the address. This is for Ms. Friedlieb; describes the residence, . . . gives a street and apartment number using the brown car as a landmark. It's right under her balcony he says. . . .

And here, tellingly, he stops using the word "it" and he says, "She's not there now, but if you go there around 5:00 or 6:00, she'll be there." I take the instruction from [defense counsel] seriously when he says, "If this is code, then we -- maybe we ought to have an expert come in here and break the code for us." I don't think it's code. I think it's a plan.

I think it's a poorly made plan and thank God it wasn't executed, but I am convinced beyond a reasonable doubt Aaron Lamont Brice did solicit the first degree murder of Ms. Friedlieb and accordingly, I find Mr. Brice guilty in the single charge in this case of solicitation of first degree murder.

We shall supply additional facts, as may be relevant, in our analysis.

## STANDARD OF REVIEW

"When an action has been tried without a jury," the judge's verdict as the factfinder will not be "set aside . . . on the evidence unless clearly erroneous, and [the

appellate court] will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8-131(c). This Court has set forth the applicable standard of review in determining the sufficiency of the evidence as follows:

> The test of appellate review of evidentiary sufficiency is whether, "'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Coleman*, 423 Md. 666, 672 (2011) (quoting *Facon v. State*, 375 Md. 435, 454 (2003)). The Court's concern is not whether the verdict is in accord with what appears to be the weight of the evidence, "but rather is only with whether the verdicts were supported with sufficient evidence—that is, evidence that either showed directly, or circumstantially, or supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offense charged beyond a reasonable doubt." *State v. Albrecht*, 336 Md. 475, 479 (1994). Further, "the finder of fact has the 'ability to choose among differing inferences that might possibly be made from a factual situation[.]' That is the fact-finder's role, not that of an appellate court." *Smith v. State*, 415 Md. 174, 183 (2010) (quoting *State v. Smith*, 374 Md. 527, 534 (2003)). Moreover, when evaluating the judgment of the trial court in a non-jury trial, the judgment of the trial court will not be set aside unless clearly erroneous. *Khalifa v. State*, 382 Md. 400, 418 (2004).

*Kamara v. State*, 205 Md. App. 607, 632 (2012). *Accord State v. Wilson*, 471 Md. 136, 159 (2020); *Fuentes v. State*, 454 Md. 296, 307-08 (2017).

## DISCUSSION

Brice argues that the solicitation was not clear enough for a "reasonable solicitee to understand that they were being asked to commit first-degree murder against" Lauren. He contends that the trial court erred in relying on evidence outside the jail call "and any relevant knowledge attributable to Rivera in concluding that the State produced sufficient evidence for both elements of the crime of solicitation to commit first-degree murder."

16

Solicitation is a common law crime. *Denicolis v. State*, 378 Md. 646, 659 (2003). "The gist of the crime is 'counselling, enticing or inducing another to commit a crime.'" *Id.* (quoting *Monoker v. State*, 321 Md. 214, 220 (1990)). The pattern jury instruction for solicitation — applicable to the charge against Brice (solicitation to commit first-degree murder) — states as follows:

> The defendant is charged with the crime of solicitation to commit [first-degree murder]. A criminal solicitation is an effort to persuade another person to commit a crime. In order to convict the defendant of solicitation, the State must prove:
>
> > (1) that the defendant urged, advised, induced, encouraged, requested, or commanded another person to commit [first-degree murder]; and
>
> > (2) that at the time the defendant made the oral or written efforts to persuade another person to commit [first-degree murder], the defendant intended that the [first-degree murder] be committed.
>
> The crime of solicitation is in the asking. It is not necessary that the first-degree murder actually be committed.

Maryland Criminal Pattern Jury Instructions ("MPJI-Cr") 4:31. The crime of solicitation is defined in our caselaw as follows:

> In *Cherry v. State*, 18 Md. App. 252, 258 (1973), we adopted the view of common law solicitation set forth in Clark and Marshall, *Law of Crimes* (7th ed., 1967), namely, that the crime "consists of the accused person's parol or written efforts to activate another to commit a criminal offense." Implicit in that, of course, is that, to constitute a solicitation, the proposal must be sufficiently clear to permit a reasonable solicitee to understand, first, what it is he or she is being asked to do, and second, that the achievement of that objective will likely involve the commission of a criminal offense.

*Frye v. State*, 62 Md. App. 310, 316 (1985).

**A.** **The court considered properly evidence, outside of the text of the jail call, that was relevant to Brice's motive and intent.**

17

In essence, Brice urges us to adopt a rule that would prohibit a factfinder from considering evidence that is extrinsic to the solicitation itself:

> The error to be avoided is allowing evidence extrinsic to the proposal and to any knowledge that can be imputed to the solicitee regarding the proposal to establish the first element of solicitation.

Such a rule, however, would restrict unlawfully the factfinder's ability to consider relevant evidence that may establish a defendant's motive and intent. For example, the parties here moved to admit — as a joint exhibit by stipulation — a list of numerous convictions that detailed Brice's history of crimes against Lauren. Brice suffered those convictions following a two-day trial, in which Lauren testified against Brice. Brice placed the relevant jail call to Rivera the day after those convictions were entered. Lauren and her father also testified about the backstory of Brice's abuses.

Moreover, the State introduced the earlier jail call in which Brice directed a family member to make a payment for the benefit of another inmate so that Brice could use that inmate's identification number to call Rivera. In addition, during Brice's jail call to Rivera, Brice told Rivera that he was calling Rivera from another inmate's ID: "That's why I called you off another ID, but that's where her house is at." Brice's attempt to conceal his identity on the database of recorded jail calls constitutes evidence that is extrinsic to the solicitation, but a factfinder is permitted nonetheless to consider that concealment as consciousness of guilt. *See* MPJI-Cr 3:26.[7] *See also Rainey v. State*, 480

---

[7] MPJI-Cr 3:26 provides, in relevant part, as follows:

(continued…)

Md. 230, 259 (2022) ("Destruction or concealment of evidence may be demonstrated by a wide spectrum of behaviors.").

The court was permitted to consider the State's evidence supporting its theory that Brice's conversation with Rivera amounted to a gossamer-veiled plan to find and shoot Lauren. Although Brice said during the call that "she got this brown car now," the State introduced evidence that Lauren did not own a brown car and neither did her current boyfriend or her family members. The State posited that Brice's reference to the brown car was as a landmark, not as the revenge target itself. Concerning that corollary, the court asked defense counsel the following questions during closing argument:

> How is it anything other than a landmark because we know, from her testimony, that he stole her white Passat, white -- I'm sorry -- Atlas, right? So he knows she -- that's not her car. What else -- what other explanation can there be but that he's using it as a landmark to direct Mr. Rivera to her residen[ce]?
>
> * * *
>
> Unless it's her car, is it your -- are you urging me to find that the Defendant asked another person to go there and fire up, or shoot up, a car that did not belong to Ms. Friedlieb?

---

You have heard that the defendant [concealed] evidence in this case. Concealment or destruction of evidence is not enough by itself to establish guilt, but may be considered as evidence of guilt. Concealment or destruction of evidence may be motivated by a variety of factors, some of which are fully consistent with innocence.
You must first decide whether the defendant [concealed] evidence in this case. If you find that the defendant [concealed] evidence in this case, then you must decide whether that conduct shows a consciousness of guilt.

19

Lauren testified that in the parking lot beneath her apartment was a brown, "goldish-tan," "abandoned" Chrysler "that never moved." Thus, it could serve as a landmark for Rivera to find Lauren, even though Brice could have been arguably more efficient and specific in prepping Rivera for the task at hand. The court was permitted to consider relevant evidence extrinsic to the jail call, including the details about the brown car and the history of the relationship between Brice and Lauren.[8] As a result, the court did not err in relying on evidence outside the text of the jail call, including relevant knowledge attributable to Rivera. Brice's argument to the contrary ignores applicable rules of evidence and the role of a trier of fact in criminal cases. *See, e.g.*, Md. Rule 5-401 (Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). *See also* MPJI-Cr 3:01 ("In reaching a verdict, you should weigh all of the evidence presented, whether direct or circumstantial.").

Relying on *Lipinksi v. State*, 333 Md. 582 (1994), Brice urges us to reverse and remand for a new trial because, according to him, "the court erroneously relied on evidence outside the call and any relevant knowledge attributable to Rivera in concluding that the State produced sufficient evidence for both elements of the crime of solicitation to commit first-degree murder." For the reasons stated above, we disagree. Moreover, Brice's reliance on *Lipinski* is unavailing. *Lipinski* involved a bench trial, in which the court "minimized the distinctions between first degree murder and second degree

---

[8] The court was permitted also to consider the relationship between Brice and Rivera, as discussed in Section B of this opinion.

murder" when rendering its verdict. *Id*. at 590. Nine months after Lipinski's trial, the Court of Appeals[9] clarified, in another case, the legal standard for establishing premeditation. *Willey v. State*, 328 Md. 126 (1992). Because the trial court in *Lipinski* applied an incorrect definition of an element of first-degree murder, the Court ordered that the judgment be vacated and remanded for further proceedings. *Lipinksi*, 333 Md. at 592-93. By contrast, the court here did not apply an incorrect definition of a charged offense. The bottom line is that there was nothing incorrect as a matter of law about the trial court's consideration of Rivera's understanding of the jail call and its consideration of relevant evidence beyond the jail call within the context of all the evidence presented.

B.     **The evidence allowed for an inference that Rivera knew about the relationship between Brice and Lauren.**

Brice contends that the evidence was insufficient because there were notable omissions in the jail call: there was no physical description of Lauren, no mention of Lauren by name, no specified amount of payment for the commission of the murder-for-hire, and no language indicating specifically that Brice was asking Rivera to kill Lauren. We disagree for three key reasons.

First, the court could infer that Rivera had a prior understanding of the relationship between Brice and Lauren. The jail call made clear that Brice and Rivera knew each other on a personal level. Brice and Rivera said during the jail call that they "love" each other, and they spoke with affection about a mutual friend named Bop. Also, during the

---

[9] On 14 December 2022, the name of the Court of Appeals was changed to the Supreme Court of Maryland.

21

jail call, Brice explained to Rivera: "Yeah, please take care of that of that, bro. I got you when I get home. Like, they done found me guilty on every fucking thing yesterday, bro." Rivera responded, "How? Oh, yeah. I (indiscernible)." From that exchange, the court could conclude rationally that Rivera knew about Brice's trial in the District Court, where he was found guilty of numerous crimes against Lauren.

Second, solicitation can occur without any discussion of a specific quid pro quo. *See* MPJI-Cr 4:31 ("The crime of solicitation is in the asking."). At minimum, the jail call established that Brice promised Rivera some recompense: "Yeah, please take care of that of that, bro. I got you when I get home." The lack of a specified amount of money or anything of value to be exchanged does not somehow render the evidence legally insufficient.

Third, a physical description of Lauren was not essential. During the jail call, Brice gave Rivera an address, an apartment number, and directions to the location where Brice believed Lauren lived. Brice gave Rivera also a landmark directly under the balcony at that location:

> [RIVERA]: "But I mean, there's hella [a lot] brown Chryslers, but I'll look."

> [BRICE]: "Nah, but it won't be. It's the only one. It's like -- trust me, you'll know because it's right under like the balcony part. Like, right -- it's always there."

Brice claims that the State presented no evidence of the use of coded language during the jail call, and thus, according to Brice, the court found correctly, "I don't think it's code." Brice overlooks, however, the context of the court's statement: "I take the

22

instruction from [defense counsel] seriously when he says, 'If this is code, then we -- maybe we ought to have an expert come in here and break the code for us.' I don't think it's code. I think it's a plan." In other words, the court suggested that the solicitation here was not subtle.

## C.  The content of the call.

Brice claims that the court was clearly erroneous in determining that he was "using the brown car as the landmark[,]" instead of as a target of revenge. We disagree. During the jail call to Rivera, Brice referred to the target of the shooting as "that bitch[.]" When Rivera said that he was going to "scope that joint out in a little bit and . . . see if she's there[,]" Brice responded: "Yeah, she's -- she's not there now, but if you go around there around like 5:00, 6:00, she'll be there. The car will be there." The court found that it was "telling[]" that Brice used the word "she" instead of "it" in context. Significantly, Brice made clear to Rivera that the brown car was "always there." He also stated to Rivera: "But if not, if not, if you don't see it there, right . . . her people live in the townhouses on Jessie Drive across from it."

After Brice directed Rivera to Lauren's parents' house, where the brown car would not have been found, Rivera asked Brice if Rivera should "fire that bitch up[,]"[10] and Brice responded in the affirmative. That fact supported the State's theory that Lauren was the target, and that Rivera knew that Lauren was the target. As stated above,

_____

[10] To be sure, Rivera testified that when he asked whether Brice wanted him to "fire that bitch up[,]" he was referring to shooting a vehicle. The judge made a specific credibility determination as to Rivera's trial testimony: "Mr. Rivera was impeached from the minute he said his name, I think. I didn't believe a word he said."

23

the State introduced evidence that Lauren did not own a brown car.  Nor did anyone close to Lauren own a brown car, as the brown car at issue was "an abandoned car outside of" the apartment where Brice believed that Lauren still resided.  Under these circumstances, the court was not clearly erroneous in determining that the brown car was a landmark, instead of a target for solicitation of a property crime.

Brice claims also that the evidence was insufficient to find him guilty of solicitation to commit first-degree murder because he did not use any language from which the court could conclude reasonably that he was asking Rivera to commit first-degree murder.  Brice argues: "To shoot someone just anywhere, e.g., a foot, is not sufficient to establish an intent to kill or communication of same."  Solicitation to commit first-degree murder does not require, however, the solicitor to describe a targeted body part of the victim.  The evidence established that Brice directed Rivera to "[s]hoot that bitch up."  Later in the conversation, Brice gave Rivera directions to Lauren's parents' home, and Rivera asked: "What you want, me to fire that bitch up?"  Brice responded: "Yeah." Based on those statements — and all of the other evidence — the court was able to infer reasonably that Brice asked Rivera to kill Lauren, rather than shoot at a vehicle outside her apartment, and Rivera understood Brice was asking him to commit first-degree murder.[11]  *See Cerrato-Molina v. State*, 223 Md. App. 329, 337 (2015) ("Choosing between competing inferences is classic grist for the [trier of fact] mill.").

---

[11] In Brice's reply brief, he offers a hypothetical in an effort, by analogy, to advance this counter-contention:

(continued…)

24

Finally, concerning the circumstances of his particular case, Brice invites us to reconsider our jurisprudence regarding challenges to the sufficiency of the evidence:

> Sufficiency challenges are not uniform, and due process is not a one-size-fits-all doctrine, especially in a criminal case, where "no issue is more important than whether the State has satisfied its burden of production." *Chisum v. State*, 227 Md. App. 118, 130 (2016). In a case such as this, a reviewing court must do more than throw up its hands in the face of putatively "competing rational inferences."

No authority exists for Brice's suggestion that our review of his sufficiency challenge should differ from our review of other sufficiency challenges. In any review of a challenge to the sufficiency of the evidence, we view "the evidence in the light most favorable to the prosecution," to determine whether "any rational trier of fact could have

---

> In a solicitation to commit first-degree murder case, the defendant makes it crystal clear in a diary entry or in a communication with someone other than the putative solicitee that he intended to kill his wife by poisoning her. The intent is clear. As to the proposal, the defendant asked the putative solicitee, an unknown waiter at a restaurant where he and his wife were dining, to put what is described by the defendant as an aphrodisiac in his "date's" drink. No evidence is introduced about any code, pursuant to which "aphrodisiac" means lethal poison. Clearly, the proposal would not permit a reasonable solicitee to understand that they are being asked to commit first-degree murder. And the fact of the defendant's true intent cannot be used to fill in the gap, without eviscerating the first element of the solicitation crime. Perhaps this hypothetical defendant could be found guilty of attempted first-degree murder, but not of solicitation to commit same.

This hypothetical is inapposite here for at least three reasons. First, unlike the husband's proposal described in the hypothetical, Brice directed Rivera to "[s]hoot that bitch up[,]" and Rivera confirmed that Brice was asking him to "fire that bitch up[.]" Second, unlike "an unknown waiter" and a customer, the evidence established that Brice and Rivera knew each other and "love[d]" each other. Third, Brice's argument casts aside the role of the factfinder and our role as an appellate court: "We do not second-guess the [factfinder's] determination where there are competing rational inferences available." *Smith v. State*, 415 Md. 174, 183 (2010).

25

found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis omitted). Indeed, "[o]ur concern . . . is not whether the verdict was in accord with the weight of the evidence but rather, whether there was sufficient evidence produced at trial that either showed directly, or circumstantially, or supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt." *Schiff v. State*, 254 Md. App. 509, 525-26 (2022) (quotation marks omitted) (quoting *Galloway v. State*, 365 Md. 599, 649 (2001)). We decline Brice's invitation to apply a different sufficiency standard to his case.

> **JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**